# Exhibit 1

First Amended Complaint

SCOTT LAKE
NV Bar No. 15765
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 6205
Reno, NV 89513
Phone: (802) 299-7495
Email: slake@biologicaldiversity.org

ROGER FLYNN
CO Bar No. 21078
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: (303) 823-5738
Email: roger@wmaplaw.org
(*pro hac vice*)

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, GREAT BASIN RESOURCE WATCH, and WESTERN SHOSHONE DEFENSE PROJECT,<br><br>    Plaintiffs,<br><br>vs.<br><br>DEBRA HAALAND in her official capacity as Secretary of the Interior, TRACY STONE-MANNING in her official capacity as the Director of the Bureau of Land Management, MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service, LAURA DANIEL-DAVIS, in her official capacity as Acting Deputy Secretary of the Interior, U.S DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and U.S. FISH AND WILDLIFE SERVICE,<br><br>    Defendants. | Case No: 2:24-cv-02043-CDS-NJK<br><br><br>**FIRST AMENDED COMPLAINT FOR VACATUR, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Plaintiffs, the Center for Biological Diversity (the Center); Great Basin Resource Watch (GBRW), and the Western Shoshone Defense Project (WSDP) file this suit for vacatur, and for equitable, declaratory and injunctive relief under the Endangered Species Act (ESA), §§ 1531 *et. seq.*, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, the Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*, other federal laws, and their implementing regulations and policies, challenging the decisions of the United States Department of the Interior (DOI), the Bureau of Land Management (BLM), and the U.S. Fish and Wildlife Service (FWS) to approve the Rhyolite Ridge Lithium/Boron Mine Project (Project/project or Mine/mine) and Plan of Operations, a large open-pit mining project on public lands proposed by Ioneer Rhyolite Ridge, LLC (Ioneer). Defendant BLM issued the Final Environmental Impact Statement (FEIS) for the Project on September 19, 2024, and Defendants DOI and Daniel-Davis approved the Project in a Record of Decision dated October 24, 2024. Defendant FWS issued a Biological Opinion (BiOp) for the Project on September 4, 2024, which permits the Project to go forward despite its impacts on threatened and endangered species.

2.      The Project would be located in the Rhyolite Ridge area of the Silver Peak Range in Esmeralda County, Nevada, on public lands managed by Defendant BLM.

3.      Due to its location, the Project poses an existential risk to an endangered wildflower—Tiehm's buckwheat (*Eriogonum tiehmii*). Tiehm's buckwheat is extremely rare—the entire global population exists within a mere 10 acres of public lands in the Rhyolite Ridge area, and efforts to locate additional populations have been wholly unsuccessful. Tiehm's buckwheat is particularly vulnerable to extinction due to its highly restricted range and specialized habitat needs. The Project would completely encircle the known range of Tiehm's buckwheat and destroy 191 acres of the species' designated critical habitat. A 960-foot-deep mine pit would be excavated just 15 feet away from the nearest Tiehm's buckwheat plant, and the southeastern portion of the species' critical habitat would be permanently covered by millions of tons of waste rock. The

threats to this vulnerable species posed by mining exploration and development have been recognized by scientists and FWS alike as particularly imminent and severe, and likely to lead to its extinction.

4.      The Project would also adversely and irreparably impact several other important and sensitive natural resources including groundwater, springs and wetlands, air quality, cultural resources, and wildlife habitat. The Project would transform a remote and seldom-visited site in the most rural county in Nevada into a bustling industrial complex covering over 7,000 acres in total.

5.      Despite the potential for significant and irreparable impacts, Defendants DOI and BLM adopted a highly accelerated permitting timeline for the project, which limited opportunities for environmental analysis and public participation. At the same time, the U.S. Department of Energy in 2023 gave Ioneer a loan of up to $700 million to construct the Project. In their rush to complete the Project, DOI, BLM, and FWS, among other things: failed to afford top priority to the conservation of Tiehm's buckwheat, as required under the ESA; failed to ensure that the Project will not jeopardize the continued existence of Tiehm's buckwheat or adversely modify its critical habitat, as required under the ESA; failed to prevent unnecessary and undue degradation of the public lands, as required under FLPMA; failed to take a "hard look" at the Project's environmental impacts, as required under NEPA and FLPMA; and relied on vague, generalized, and insufficiently developed minimization and mitigation measures, in violation of the ESA, NEPA and FLPMA.

6.      DOI and BLM authorized the Project based on the unsupported assumption that Ioneer holds "valid existing rights" under the 1872 Mining Law for its claims covering all Project components and operations, and failed determine whether Ioneer's mining and millsite claims are in fact valid, thus significantly hamstringing the agency's discretionary authority over the Project In addition, DOI and BLM failed to issue, or require, the necessary federal permits and rights-of-way for ancillary mine-related infrastructure including but not limited to a 13-mile water pipeline and access corridor.

7.    For these and the related reasons addressed herein, Plaintiffs ask this Court to declare that the ROD, FEIS, BiOp, and Project approvals and decisions signed and prepared by DOI, BLM and FWS for the Project violate federal law. Plaintiffs ask this court to set aside/vacate and remand the decisions to BLM and FWS, and enjoin any construction, operation, or development of the Project, including any Project-related exploration, until the violations have been corrected.

### JURISDICTION

8.    This is a suit pursuant to the ESA, APA, FLPMA, NEPA, and other federal statutes, regulations and requirements. Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief). Jurisdiction is also conferred by the ESA, 16 U.S.C. §1531, *et seq*. Plaintiffs sent BLM (and the Secretary of the Interior) a letter on October 24 and 25, 2024, notifying the agency of Plaintiffs' intent to sue over the BLM's violation of the ESA. *See* 16 U.S.C. § 1540(g) (citizen suit provision).

9.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b) and (e). The BLM Tonopah Field Office, which produced the FEIS and is responsible for the Project's compliance with applicable laws and regulations, is located in Nye County, Nevada. The Project is located in Esmeralda County, Nevada. Some or all Plaintiffs are located and reside in Nevada.

10.    Venue is proper in the Southern Division of this District, as the challenge involves federal lands and resources in Esmeralda County. L.R. 1A 1-6.

### PARTIES

11.    The Center is a tax-exempt, non-profit, membership organization with 87,904 members, including 691 members in Nevada. The Center's main office is in Tucson, Arizona. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center's members' diverse interests span natural history, ecology, conservation, wildlife and native plant observation, nature photography, hiking, camping, backpacking, quiet and solitude in nature, dark skies, spiritual renewal, and a love of the Great Basin's natural landscapes. The Center's members derive benefit from engaging with

landscapes and the endangered species that reside there. The Center's members expect and rely upon federal and state regulatory agencies, such as BLM, to protect the species, habitats, viewsheds, and air and water quality of these lands. The Project would be located in and have effects to lands and waters where Center staff and members have enjoyed, and intend to continue enjoying in the coming months, camping, hiking, photographing natural high desert beauty, appreciating Tiehm's buckwheat, bighorn sheep, pronghorn, greater sage-grouse and other wildlife in the area. These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

12.     Plaintiff Great Basin Resource Watch (GBRW) is a non-profit organization based in Reno, Nevada that is concerned with protecting the Great Basin's land, air, water, wildlife and communities from the adverse impacts of hardrock mining. GBRW members include ranchers, sportsmen, conservationists, and Native Americans dedicated to protecting the communities, land, air, water and Native American resources of the Great Basin. Members of GBRW have used, enjoyed, and valued the area of the Project, including the Project site, for many years. Members of GBRW hike, view and photograph wild plant and animal life, and generally enjoy using the area of the Project for recreational, historical, conservation, and aesthetic purposes. Members of GBRW intend on continuing to use and value the lands at, and affected by, the Project during 2024 and in future years. These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

13.     Plaintiff Western Shoshone Defense Project (WSDP) works to protect and preserve Western Shoshone rights and homelands for present and future generations based upon cultural and spiritual traditions. WSDP staff operate under the guidance of a director and a Community Advisory Board with members from various Western Shoshone communities. WSDP and its members have concrete and significant interests in the lands affected by the Project, and regularly use these lands for traditional, cultural, and religious uses. These interests will be negatively affected, and many will be eliminated, by the Project.

14.     Plaintiffs bring this action on their own behalf, and on behalf of their members. Plaintiffs and/or their members regularly use and enjoy the federal public lands managed by the BLM within the Tonopah Planning Area, including the lands within the Project Area.

15.     By authorizing the Project, Defendants approved actions that will significantly and irreparably harm Plaintiffs' interests in the Rhyolite Ridge area and Tiehm's buckwheat. The legal violations alleged in this Complaint cause direct injury to Plaintiffs' health, recreational, inspirational, religious, scientific, educational, and aesthetic interests. Plaintiffs and their members have been and will continue to be adversely affected and irreparably harmed if Defendants' ongoing violations of the ESA, FLPMA, NEPA, and the APA continue. These are actual, concrete injuries caused by the BLM's violations of the ESA, FLPMA, NEPA, and the APA. Plaintiffs and their members' injuries will be redressed by the relief sought.

16.     Defendants' failure to comply with NEPA and FLPMA additionally harms Plaintiffs and their members by denying them the right to informed decision-making and full disclosure under NEPA and FLPMA, as well as the right to meaningfully participate in the decision-making process.

17.     Defendant DOI is a cabinet-level executive agency responsible for, among other things, managing federally-owned lands, wildlife, and public natural resources throughout the United States. DOI has the ultimate responsibility to administer and implement FLPMA, and to comply with all other applicable federal laws, including NEPA and the ESA.

18.     Defendant Debra Haaland, U.S. Secretary of the Interior, is the highest-ranking official within DOI, and in that capacity has ultimate responsibility for the administration of federal public lands and implementation of the statutes applicable thereto, including FLPMA, NEPA and the ESA. Secretary Haaland is sued in her official capacity.

19.     Defendant Laura Daniel-Davis is the Acting Deputy Secretary of the Interior, and in that capacity is responsible for the administration of federal public lands and implementation of the statutes applicable thereto, including FLPMA, NEPA and the ESA. Acting Deputy Secretary

Daniel-Davis signed the 2024 ROD, which formally approved the Project. She is sued in her official capacity.

20.     Defendant BLM is an agency of Defendant DOI. BLM and its officers are responsible for administering federally-owned public lands and natural resources, under all federal laws applicable thereto, including NEPA, FLPMA and the ESA.

21.     Defendant FWS is an agency of Defendant DOI. FWS and its officers are responsible for administering the ESA, particularly regarding potential impacts to wildlife species that have been listed as threatened or endangered with extinction pursuant to the ESA.

22.     Defendant Martha Williams is the Director of FWS. The Secretary of the Interior has delegated the authority to administer the ESA to FWS for non-marine wildlife and plants. 50 C.F.R. § 402.01(b). Director Williams is sued in her official capacity.

## LEGAL BACKGROUND

### A.  The Administrative Procedure Act (APA)

23.     The APA provides for judicial review of federal agency actions for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy are subject to judicial review. *Id.* § 704.

24.     The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706.

25.     An agency action is arbitrary and capricious if the agency relied on factors which Congress did not intend for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**B. The Endangered Species Act (ESA)**

26.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is designed to conserve the ecosystems upon which endangered and threatened species depend and to provide a program to conserve listed species. 16 U.S.C. § 1531(b). "[T]he plain intent of Congress in enacting the [ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Hill*, 437 U.S. at 184.

*i.    ESA Section 7(a)(1) Affirmative Conservation Duty*

27.    Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), requires all federal agencies—including BLM and DOI—to utilize their authorities to further the "conservation" of threatened and endangered species. "Conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3), i.e., to bring about the recovery of a species listed as endangered or threatened. The language of Section 7(a)(1) reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Hill*, 437 U.S. at 185; *see also Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 259 (9th Cir. 1984); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1417-18 (9th Cir. 1990).

*ii.    ESA Section 7(a)(2) Duty to Insure Against Jeopardy and Adverse Modification*

28.    ESA Section 7(a)(2) requires each federal agency, in consultation with a federal wildlife agency (FWS for Tiehm's buckwheat), to ensure that any proposed action is not likely to jeopardize the continued existence of a listed species or destroy or adversely modify its critical habitat. *Id.* § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse

8

modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

29.    As the U.S. Supreme Court has explained, "insure" in Section 7(a)(2) means "[t]o make certain, to secure, to guarantee." *Center for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023) (*quoting Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2008)).

30.    The ESA defines critical habitat as: (1) specific areas of occupied habitat that contain the "physical or biological features [PBFs] essential to the conservation of the species" and "which may require special management considerations or protection," and (2) unoccupied habitat that is "essential for the conservation of the species." *See* 50 C.F.R. § 424.19. As noted, "conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

31.    If any agency action "may affect" a listed species or its critical habitat, "formal consultation" is required unless FWS concurs in writing that the action is "not likely to adversely affect" the species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12; *id.* § 402.14(a)-(b). During formal consultation, FWS must review all relevant information, evaluate the current status and environmental baseline of the species, and evaluate the effects and cumulative effects of the proposed action on the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)-(3). The "'[e]ffects of the action' refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. FWS must "[a]dd the effects of the action and cumulative effects to the environmental baseline and[,] in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of [the] listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). Throughout its analysis, the

Service must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

32.     At the conclusion of consultation, Fish and Wildlife Service issues a "biological opinion [BiOp] as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(4). If the Service concludes that the proposed action "will jeopardize the continued existence of" a listed species or adversely modify critical habitat, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

33.     To comply with Section 7(a)(2), a BiOp must identify the conditions necessary for a species' survival and recovery. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) ("It is only logical to require that the agency know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat that is already severely degraded."). Further, the BiOp must consider impacts on recovery; a BiOp that focuses solely on whether a species can cling to survival despite an action's adverse effects violates the ESA. *Id.* at 917.

34.     Although the ESA's implementing regulations direct FWS to "give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant," 50 C.F.R. § 402.14(g)(8), a BiOp cannot rely upon mitigation or minimization plans that "refer only to generalized contingencies or gesture at hopeful plans" in reaching a "no jeopardy" or "no adverse modification" conclusion. *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 744 (9th Cir. 2020).

35.     If an action agency fails to carry out the mitigation measures contained in a BiOp, it must re-initiate consultation with FWS. 50 C.F.R. § 402.16(c). If the action agency does not re-initiate consultation, the BiOp is invalid. *Bernhardt*, 982 F.3d at 744. An indefinite mitigation measure is less likely to trigger re-consultation because it will be difficult to know at which point or whether the action agency has failed to comply. "For this reason, measures that are too vague,

or do not commit resources, or are otherwise insufficiently integrated into the proposed action are generally unenforceable under the ESA, and thus cannot be properly relied upon." *Id.*

36.     Although the wildlife agency is responsible for the content of the biological opinion, the ultimate duty to ensure that an activity does not jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, lies with the action agency—in this case, BLM. An agency's reliance on an arbitrary, capricious, and/or invalid biological opinion is likely to support the conclusion that the relying agency violated § 7(a)(2)'s substantive duty to ensure against jeopardy and adverse modification. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

### *iii.    ESA Notice Requirements and "Citizen-Suit" Jurisdiction*

37.     The ESA provides that "any person may commence a civil suit on his own behalf … to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1).

38.     Such an action may be "commenced" after "sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." *Id.* § 1540(g)(2)(A)(i).

39.     On October 24 and 25, 2024, Plaintiffs gave notice via electronic mail and U.S. Certified Mail of their intent to sue Defendants DOI, FWS, and BLM for violations of the Endangered Species Act pursuant to 16 U.S.C. § 1540(g)(1). BLM took no action in response to Plaintiffs' notice letter.

### C.  The Mining Law of 1872

40.     The Mining Law of 1872 (Mining Law) gives to United States citizens free of charge, except for small filing and other fees, mining rights upon discovery of "valuable minerals" on federal land. 30 U.S.C. §§ 21-54. Under the Mining Law, U.S. citizens may claim and occupy any federal lands which contain a "valuable mineral deposit" for mining purposes, *id.* § 22, provided those lands have not been withdrawn from the operation of the Mining Law by Congress,

the President, or the Department of the Interior, *see Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 33 F.4th 1202, 1208-09 (9th Cir. 2022).

41.    A "valuable mineral deposit" is "mineral [that] can be 'extracted, removed and marketed at a profit.'" *United States v. Coleman*, 390 U.S. 599, 600 (1968). In the absence of a discovery of a valuable mineral deposit, Section 22 of the Mining Law gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration. *Center for Biological Diversity*, 33 F.4th at 1209.

42.    The Mining Law also allows the owner of a valid mining claim on lands containing a valuable mineral deposit to obtain occupation rights to a valid millsite claim, which is defined as "nonmineral land not contiguous" to the valuable mineral deposit, "for mining or milling purposes." 30 U.S.C. § 42(a). The Mining Law limits individual millsites to five acres. *See* 30 U.S.C. § 42.

43.    Under the Mining Law, "no right arises from an invalid claim of any kind" because the contrary holding would "work an unlawful private appropriation in derogation of the rights of the public." *Cameron v. United States*, 252 U.S. 450, 460 (1920).

**D.  The Federal Land Policy and Management Act (FLPMA)**

44.    FLPMA is the "organic act" of BLM and governs the agency's management of public lands and resources. In FLPMA, Congress declared that is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and that, "where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8).

*i.   **BLM's Duty to Prevent Unnecessary and Undue Degradation (UUD)***

45.    FLPMA requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation [UUD] of the lands." 43 U.S.C. § 1732(b). In preceding sentence, Congress made it explicit (albeit by negative phrasing) that this mandate "amend[ed] the Mining Law of 1872 [and]

impair[ed] the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress." *Id.* "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and state law." *Center for Biological Diversity v. U.S. Department of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010).

46.     BLM's mining regulations have long defined UUD as "conditions, activities, or practices" that: (1) fail to comply with enumerated "performance standards" at 43 C.F.R. § 3809.420; (2) fail to comply with the terms and conditions of an approved Mine Plan; (3) are not "reasonably incident" to mining; or (3) violate environmental protection standards for specially designated areas including Wild and Scenic Rivers, National Monuments, and designated Wilderness. 43 C.F.R. § 3809.5.

47.     However, in April 2024 BLM issued a revised definition of UUD in its Conservation and Landscape Health Final Rule. *See* Bureau of Land Management, *Conservation and Landscape Health, Final Rule*, 89 Fed. Reg. 40308-49, 40319-20 (May 9, 2024). The revised definition provides:

> "Unnecessary or undue degradation" means harm to resources or values that is not necessary to accomplish a use's stated goals or is excessive or disproportionate to the proposed action or an existing disturbance. Unnecessary or undue degradation includes two distinct elements: "Unnecessary degradation" means harm to land resources or values that is not needed to accomplish a use's stated goals. For example, approving a proposed access road causing damage to critical habitat for a plant listed as endangered under the Endangered Species Act that could be located without any such impacts and still provide the needed access may result in unnecessary degradation. "Undue degradation" means harm to land resources or values that is excessive or disproportionate to the proposed action or an existing disturbance. **For example, approving a proposed access road causing damage to the only remaining critical habitat for a plant listed as endangered under the Endangered Species Act, even if there is not another location for the road, may result in undue degradation.** The statutory obligation to prevent "unnecessary or undue degradation" applies when either unnecessary degradation or undue degradation, and not necessarily both, is implicated.

43 C.F.R. § 6101.4(aa) (emphasis added). *See also* ROD at 8-9 (recognizing that both the 3809 and 6101 UUD standards apply to BLM's review and approval of the Project).

48.     Under either standard, harm to threatened and endangered species or their habitat constitutes UUD. *Id.*; 43 C.F.R. § 3809.420(b)(7) ("The operator shall take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations.").

49.     To prevent UUD, BLM must also ensure that the Project will comply with all applicable State and Federal environmental protection standards, including water quality standards and State permitting requirements. *See id.* § 3809.5 (defining "Unnecessary of Undue Degradation" as "fail[ure] to comply with . . . Federal and state laws related to environmental protection"); *id.* § 3809.420(b)(4) (requiring "[a]ll operators" to "comply with applicable Federal and state water quality standards").

50.     Finally, failure to conduct a proper NEPA analysis violates not only NEPA, but FLPMA's mandate to prevent UUD, which is a fundamental requirement of BLM's review of proposed mining plans under FLPMA. As the Interior Department has held:

> Like NEPA, the [UUD] definition requires BLM to consider the nature and extent of surface disturbances resulting from a proposed operation and environmental impacts on resources and lands outside the area of operations. *Kendall's Concerned Area Residents*, 129 IBLA 130, 140-41 (1994); *Nez Perce Tribal Executive Committee*, 120 IBLA 34, 36 (1991); *see Sierra Club v. Hodel*, 848 F.2d 1068, 1078, 1091 (10th Cir.1988) (nondegradation duty is mandatory). . . . [M]ost disturbed land at the mine sites is public land and other public land is adjacent to them. To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation.

*Island Mountain Protectors*, 144 IBLA 168, 202, 1998 WL 344223, * 28 (Interior Board of Land Appeals, IBLA) (internal citations omitted, emphasis added).

### ii.     *BLM's Authority to Permit Pipelines, Powerlines, and Other Types of Infrastructure on Public Lands*

51.     BLM's authority to permit water pipelines, powerlines, access roads, and other ancillary infrastructure associated with mining projects is not found in the Mining Law but rather in FLMPA Title V. Under Title V, Section 504, BLM may grant a Right-of-Way (ROW) for such

infrastructure only if it "(4) will do no unnecessary damage to the environment." 43 U.S.C. § 1764(a)

52.    Rights of way "shall be granted, issued or renewed . . . consistent with . . . any other applicable laws." *Id.* § 1764(c). A right-of-way that "may have significant impact on the environment" requires submission of a plan of construction, operation, and rehabilitation of the right-of-way. *Id.* § 1764(d).

53.    A Title V ROW "shall contain terms and conditions which will . . . (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." *Id.* § 1765(a). *See also* § 1765(b) (additional environmental protection requirements). The terms of this section do not limit "damage" specifically to the land within the ROW corridor, but to all lands and resources that may be affected by the ROW (here, the Project and all its impacts).

54.    BLM not only has the authority to consider the adverse impacts on lands and waters outside the immediate ROW corridor, but it also has an obligation to protect these public resources under FLPMA. *See County of Okanogan v. National Marine Fisheries Service*, 347 F.3d 1081 (9th Cir. 2003).

### iii.    Duty to Comply With the Applicable Resource Management Plan (RMP)

55.    FLPMA requires that all activities approved by BLM comply with the requirements of the binding Resource Management Plans (RMPs), also known as "land use plans." "The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available." 43 U.S.C. § 1732(a)

56.    A violation of the RMP is a violation of FLPMA. *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1128 (9th Cir. 2007) (explaining that BLM-approved project components were "inconsistent with the Plan" and, consequently, violated FLPMA).

57.    BLM regulations require that all resource management decisions "conform to the approved [land use] plan." 43 C.F.R. § 1610.5-3. Regulations at 43 C.F.R. § 1601.0-5(b) define

"conformity" as requiring that "a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment." "Consistent," in turn, is defined as requiring that management actions "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans . . . ." *Id.* § 1601.0-5(c).

58.    BLM must also ensure compliance with the RMP as part of its duty to avoid UUD. 43 U.S.C. § 1732(b).

59.    Accordingly, there is no general exemption from the FLPMA RMP requirements for mineral operations. As BLM has recognized, mines on public lands must comply with all RMP provisions. *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 49 (D.D.C. 2003) ("[W]hen BLM receives a proposed plan of operations under the 2001 rules, pursuant to Section 3809.420(a)(3), it assures [sic] that the proposed mining use conforms to the terms, conditions, and decisions of the applicable land use plan, in full compliance with FLPMA's land use planning and multiple use policies.").

60.    The applicable RMP in this case is the 1997 Tonopah RMP.

61.    The Tonopah RMP incorporates BLM's policy for the protection of sensitive, threatened, and endangered species, referred to as the "special status species policy." *See* Bureau of Land Management, Approved Tonopah Resource Management Plan and Record of Decision 9-10 (October 1997).

62.    The objectives of the BLM special status species policy are: (a) to conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species; and (b) to initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA. U.S. Dep't of the Interior BLM, Special Status Species Mgmt. Manual § 6840 at 3 (2008) [hereinafter, "*Special Status Species Manual*"]. BLM has explained the purposes of the special status species policy as follows:

> It is in the interest of the BLM to undertake conservation actions for such species before listing is warranted. It is also in the interest of the public for the BLM to undertake conservation actions to improve status of Sensitive Species so sensitive recognition is no longer warranted. By doing so, BLM will have greater flexibility in managing public lands to accomplish native species conservation objectives and other legal mandates.

> [A]s specified in the FLPMA, the BLM shall designate Bureau sensitive species and implement measures to conserve these species and their habitats, including ESA proposed critical habitat, to promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.

*Id.* at 36.

### E.  The National Environmental Policy Act (NEPA)

63.     "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); *see also* 42 U.S.C. § 4332(2)(C). NEPA imposes procedural requirements directing agencies to take a "hard look" at environmental consequences, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

64.     NEPA requires federal agencies to prepare a detailed Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

65.     An EIS must include a full and adequate analysis of environmental impacts of a Project and alternatives and take a "hard look" at the direct, indirect, and cumulative impacts of the Project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. *See id.*; 40 C.F.R. § 1502.6; 40 C.F.R. § 1508.1(i).

66.     NEPA review must be supported by detailed data and analysis; unsupported conclusions violate NEPA. *See Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998); *N. Plains v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (conclusions must be supported by reliable studies).

67.     A "critical" part of the "hard look" required under NEPA involves "[e]stablishing appropriate baseline conditions[.]" *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). "Without establishing the baseline conditions . . . *before a project begins*, there is simply no way to determine what effect the project will have on the environment and, consequently, no way to comply with NEPA." *Id.* (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)) (emphasis added) (modifications normalized); *see also Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).

68.     Baseline data must be gathered and analyzed before the proposed action is approved, not afterward. *See LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988) ("[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action.") (internal citation and quotation marks omitted). "[O]nce a project begins, the 'pre-project environment' becomes a thing of the past" and evaluation of the project's impacts becomes "simply impossible." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011).

69.     NEPA requires that DOI/BLM review mitigation measures as part of the NEPA process—not in some future decision shielded from public review:

> Putting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decision-making. *See Robertson [v. Methow Valley Citizens Council]*, 490 U.S. [332,] 353, 109 S.Ct. 1835 [1989] ("Without [a reasonably complete] discussion [of mitigation], neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects.").

*Great Basin Resource Watch*, 844 F.3d at 1107.

70.     Under NEPA, BLM cannot rely on purported mitigation measures to comply with environmental protection standards when those mitigation measures have not been subject to public review. "[A] post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS." *Id.* at 1104.

71.    An EIS must include a robust discussion of cumulative impacts. An agency's obligation under NEPA to consider cumulative impacts extends to all "past," "present," and "reasonably foreseeable future actions." 40 C.F.R. § 1508.1(i). This analysis must include Project-specific cumulative data, a detailed quantified assessment of other projects' combined environmental impacts, and objective quantification of the impacts from other past, existing and proposed activities within the affected area. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971-74 (9th Cir. 2006).

72.    "Environmental impact statements shall state how alternatives considered in them and decisions based on them will or will not achieve the requirements of sections 101 and 102(1) of NEPA," NEPA implementing regulations, and "other environmental laws and policies." 40 C.F.R. §1502.2(d).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Rhyolite Ridge

73.    Rhyolite Ridge is located in the Silver Peak Range of Esmeralda County, Nevada, within the traditional territory of the Shoshone and Paiute peoples, on federal public lands managed by the BLM Tonopah Field Office. To the west is Fish Lake Valley, which contains extensive groundwater-dependent wetlands, also located on BLM-managed public lands. The southern end of Fish Lake Valley hosts a small agricultural community and the unincorporated town of Dyer.

74.    The Rhyolite Ridge area has a dry, high desert climate; average annual precipitation is less than four inches. The main vegetation communities are Great Basin shrubland and pinyon-juniper woodland, interspaced with sparsely vegetated areas and rock outcrops. There are dozens of natural springs in and around the Project area, including the culturally significant Cave Spring.

75.    The shrublands, woodland, and springs at Rhyolite Ridge provide high-quality habitat for numerous wildlife species, including but not limited to: bighorn sheep, pronghorn (antelope), mule deer, golden eagles, greater sage-grouse, and pinyon jay. Many of the wildlife species found at Rhyolite Ridge or in Fish Lake Valley are BLM-designated "sensitive" species and/or have been proposed for ESA listing.

76.     The Rhyolite Ridge area has historical, spiritual, and cultural significance to Shoshone and Paiute peoples. Oral histories estimate that there were 3,000 Western Shoshone living in Fish Lake Valley before European contact. The Shoshone and Paiute traditionally hunted big game and collected plants for food and medicine at Rhyolite Ridge. Shoshone and Paiute people also fished in the creeks of the White Mountain range to the west, and built irrigation systems to maintain and enhance natural plant communities in Fish Lake Valley.

77.     Cave Spring is an irreplaceable Western Shoshone and Paiute sacred site which is essential to the continued intergenerational transmission of local indigenous identity—among other things, it is where Western Shoshone families go to educate young people about Shoshone identity and share sacred teachings through story. The Shoshone and Paiute cultural practices involving Cave Spring cannot be achieved at any other site.

78.     There are several other projects and activities either currently proceeding or proposed in Fish Lake Valley, including agriculture, geothermal energy development, and other mineral exploration and development, which could cumulatively impact the environment. Agricultural pumping in Fish Lake Valley has significantly lowered the water table and threatens to permanently deplete the groundwater supply. There are active geothermal leases encompassing part or all of 47 sections of public land in the vicinity of the Fish Lake Valley wetlands, including leases held by Open Mountain Energy, Ormat, and a subsidiary of Fervo Energy. Geothermal exploration and development would impact groundwater resources by pumping and reinjecting large volumes of water and changing the subsurface hydrology. There are also several other lithium mining prospects and potentially thousands of mining claims. Lithium Corporation claims to hold 11,360 acres of mining claims in Fish Lake Valley, targeting brines underneath the playa. Acme Lithium Inc. claims to hold 4,139 acres of mining claims in Fish Lake Valley. Their mining claims are lode claims, meaning they would be targeting lithium claystones for an open-pit mine. They have conducted geophysical surveys and surface sampling. Nevada Alaska Mining Company also holds a significant number of claims in the area.

**B. Tiehm's buckwheat**

79.     Tiehm's buckwheat (*Eriogonum tiehmii*) is a perennial herb in the wild buckwheat genus, *Eriogonum*. U.S. Fish and Wildlife Service, *Endangered and Threatened Wildlife and Plants; Endangered Species Status and Designation of Critical Habitat for Tiehm's Buckwheat*, 87 Fed. Reg. 77368, 77369 (December 16, 2022) [hereinafter, *Listing Rule*]. It was first discovered in 1983 and described in 1985. *Id.* "All available taxonomic and genetic research information indicates that Tiehm's buckwheat is a valid and recognizable taxon and represents a distinct species." *Id.*

80.     Tiehm's buckwheat is a dense mounded herb that spreads low across the landscape. Its leaves are either white or gray. *Id.* Flowers, which bloom through May and June, are generally light yellow and turn red with age. *Id.*

81.     The entire global population of Tiehm's buckwheat exists on 10 acres of BLM-managed public land between 5,960 and 6,200 feet elevation in the Rhyolite Ridge area of the Silver Peak Range. *Id.* at 77369-70. A 2019 survey found eight populations, counting 43,000 plants in total, covering approximately 10 acres across a three square mile area. *See id.* at 77371-72, Table 1. Surveys for other potential sites yielded no discoveries of additional populations, and the likelihood of additional populations being discovered is very low. *See* U.S. Fish and Wildlife Service, Biological Opinion for the Rhyolite Ridge Lithium-Boron Mine Project 25 (September 4, 2024) [hereinafter, "BiOp"].

82.     Researchers have recognized eight distinct subpopulations within the one known existing population. *Listing Rule*, 87 Fed. Reg. at 77370. The subpopulations are separated by a rural, unpaved, county road known as the Cave Springs Road. *See id*. Subpopulations 1, 2, and 8 occur north of the road, and subpopulations 3, 4, 5, 6, and 7 occur south of the road. *Id.* The

subpopulations south of the road will be most impacted by the proposed mine, as they are 15 feet from proposed mine pit and within 200 feet of a waste rock dump.[1] *See* BiOp at 42.

83.     Approximately 60 percent of the total Tiehm's buckwheat population was lost in an unprecedented depredation event in late 2020 that has been attributed to herbivory. *Id.* at 77373. A population census following this incident found fewer than 16,000 plants. *Id.* at 77371-72, Table 1. In its Final Rule listing Tiehm's buckwheat as an endangered species, FWS found that "[t]he 2020 herbivory event . . . was extensive enough to compromise the long-term viability of individuals, subpopulations, and the overall population." *Id.* at 77373.

84.     Tiehm's buckwheat's extremely small range indicates it is highly adapted to the specific conditions in which it grows, which include open, dry, barren, and highly mineralized soil types that are generally considered poor or unproductive, as well as an unusually abundant and diverse native pollinator community. *Id.* at 77369-70. Researchers consider Tiehm's buckwheat to be a "soil specialist" because "it occurs primarily or exclusively on challenging soils that differ from the surrounding soil matrix and grows better on soils with these conditions." *Id.* at 77389; *see also id.* at 77369, 77374. Given the species' highly restricted range, there are likely other, unknown factors that also determine habitat suitability.

85.     Within occupied areas, the vegetation varies from exclusively Tiehm's buckwheat plants to sparse associations with a few other low-growing shrubs, herbs, and grass species, such as shadscale saltbush (*Atriplex confertifolia*), black sagebrush (*Artemisia nova*), Nevada Mormon tea (*Ephedra nevadensis*), James' galleta (*Hilaria jamesii*), and alkali sacaton (*Sporobolus airoides*). *Id.* at 77370.

---

[1] The BiOp, Final EIS, Biological Assessment, Plan of Operations, and other supporting documents for the Project use euphemistic language to describe the mine facilities. For example, the mine pit is referred to as a "quarry," the tailings dump is called a "spent ore storage facility," or "SOSF," and waste rock dumps are called "overburden storage facilities," or "OSFs." *See, e.g.*, BiOp at 5-11. For clarity, this Complaint will utilize the standard terminology unless quoting directly from these sources.

86.    Tiehm's buckwheat supports an "especially high" abundance and diversity of arthropods (insects, mites, and spiders), and FWS has concluded, based on peer-reviewed research (McClinton et al. 2022) that "the presence of an intact pollinator community is important for maintaining the species." *Id.* at 77370; *see also* U.S. Fish and Wildlife Service, Species Status Assessment Report for *Eriogonum tiehmii* (Tiehm's Buckwheat), Version 2.0  6, 15-21 (May 2022) [hereinafter, "SSA"].

87.    The leading threats to Tiehm's buckwheat are: (1) mineral exploration and development, (2) road development and off-highway-vehicle (OHV) use, (3) livestock grazing, (4) nonnative, invasive plant species, (5) herbivory, and (6) climate change. *Listing Rule*, 87 Fed. Reg. at 77373; SSA at 27. "Climate change may further influence the degree to which these threats, individually or collectively, . . . affect Tiehm's buckwheat." *Listing Rule*, 87 Fed. Reg. at 77373.

88.    Mineral exploration and development presents the most severe and immediate threat—the Project would require the long-term elimination of 191 acres of designated critical habitat and result in various indirect adverse impacts including habitat fragmentation, proliferation of invasive species, fugitive dust pollution, changes in hydrology, land subsidence, geologic instability from mine-pit excavation, direct and indirect impacts to pollinators, and others. *See* BA at 8-5 to 8-32; Naomi Fraga, Ph.D., Assessment of the Buckwheat Protection Plant for the Draft Environmental Impact Statement of the Rhyolite Ridge Lithium-Boron Mine, Esmeralda County, Nevada (May 30, 2024) [hereinafter, "Fraga 2024a"].

89.    Exploration to support development of the proposed Project began in 2018 and has already had a profound impact on Tiehm's buckwheat and its native ecosystem. Ioneer's two 2018 exploration projects—authorized by BLM without public notice or an environmental impacts analysis, contrary to BLM's mining regulations, *see* Complaint, *Center for Biological Diversity v. Bureau of Land Management*, No. 2:19-cv-01915, ECF 1 (D. Nev. Oct. 30, 2019)—disturbed 15 acres of habitat (or 0.7 percent of the disturbance authorized under the ROD), and resulted in the loss of native vegetation cover, proliferation of invasive species, altered soil structure, and the

creation of new vehicle routes that led to increasing OHV incursions into occupied habitat. Fraga 2024a.

90.     On October 7, 2019, due to the impacts from exploration and potential impacts from the proposed Project, the Center petitioned FWS to list Tiehm's buckwheat under the Endangered Species Act. Center for Biological Diversity, Emergency Petition to the U.S. Fish And Wildlife Service to List Tiehm's Buckwheat (*Eriogonum tiehmii*) under the Endangered Species Act as an Endangered or Threatened Species and to Concurrently Designate Critical Habitat (October 7, 2019) [hereinafter, "Listing Petition"]. Following the submission of the listing petition, mining exploration activity at Rhyolite Ridge appears to have accelerated. Letter from Patrick Donnelly, Center for Biological Diversity, to Jon Raby, BLM, re: Ongoing mineral exploration activities at Rhyolite Ridge affecting Tiehm's buckwheat (Oct. 29, 2019).

91.     On October 30, 2019, the Center filed suit in this Court challenging BLM's unlawful approval of Ioneer's exploration activities as contrary to FLPMA, NEPA, and BLM mining regulations. *See Complaint, Center for Biological Diversity v. Bureau of Land Management*, Case 2:19-cv-01915, ECF 1 (D. Nev. October 30, 2019). The litigation concluded in January 2020 when the Center and Ioneer reached a settlement agreement under which the Center agreed to withdrew its request for injunctive relief and Ioneer agreed to provide concurrent notice of any future exploration operations authorized under BLM's mining regulations at 43 C.F.R. Part 3809. *See* Stipulation, Exhibit 1 to Motion, *Center for Biological Diversity v. Bureau of Land Management*, Case 2:19-cv-01915, ECF 33-1 (January 3, 2020).

92.     Under the terms of Ioneer's 2018 exploration notices, Ioneer was required to reclaim disturbed areas through re-grading and re-seeding. Exhibit 2 to Answer (Declaration of Perry B. Wickham, BLM), *Center for Biological Diversity v. Bureau of Land Management*, No. 2:19-cv-01915-GMN-EJY, ECF 27-2 (D. Nev. December 6, 2019). However, areas disturbed by exploration have not been successfully reclaimed and invasive species continue to spread throughout Tiehm's buckwheat critical habitat, including occupied habitat. Naomi Fraga, Ph.D., Comments on the USFWS Biological Opinion and Buckwheat Protection Plan for the Final

Environmental Impact Statement of the Rhyolite Ridge Lithium-Boron Mine, Esmeralda County, Nevada (Oct. 20, 2024), [hereinafter "Fraga 2024b"], Appendix A at 1 ("Reclamation within exploration areas has been ineffective to date as evidenced by the relatively low cover of native vegetation and the relatively high cover of non-native species occurring at these sites.").

93.    "Surveys of Tiehm's buckwheat conducted between 1994 and 2010 did not document any occurrences of nonnative, invasive species in its habitat." *Listing Rule*, 87 Fed. Reg. at 77376. However, since 2019 the invasive species *Halogeton glomeratus* or "saltlover" has quickly become "the most abundant non-native, invasive species within and adjacent to all subpopulations of E. tiehmii, especially in areas disturbed from mining exploration activities." SSA at 31-32. The disturbance from mining exploration has served as a vector for invasion of occupied Tiehm's buckwheat habitat. Fraga 2024b, Appendix A at 3-4. In 2021, surveys conducted for Ioneer estimated *H. glomeratus* cover to be equal to or greater than Tiehm's buckwheat in all subpopulations. *Id.* at 5. More recent surveys show even greater cover of *H. glomeratus*, despite Ioneer's attempts at reclamation. *Id.* at 3-4.

94.    Other non-native species recently documented within Tiehm's buckwheat critical habitat include Russian thistle (*Salsola tragus*) cheatgrass (*Bromus tectorum*); small alyssum (*Alyssum alyssoides*); crossflower (*Chorispora tenella*); Russian olive (*Elaeagnus angustifolia*); tall whitetop (*Lepidium draba*); curly dock (*Rumex crispus*); sweet clover (*Melilotus officinalis*); rabbitfoot grass (*Polypogon monspeliensis*); and yellow salsify (*Tragopogon dubius*). *Id.* at 2-3.

95.    "The abundance and distribution of non-native and invasive species within . . . Tiehm's buckwheat critical habitat is highly associated with disturbance from mining exploration activities, including the blading of roads, and placement of mining infrastructure." *Id.* at 1.

96.    In addition to mining exploration disturbance and associated weed invasion, Tiehm's buckwheat and its habitat have been adversely impacted by OHV incursions, livestock grazing, and naturally occurring threats.

97.     OHV use has been documented as an emerging threat to Tiehm's buckwheat following Ioneer's first round of exploration. OHVs can compact soil, crush plants, fragment habitat, and reduce overall species diversity. *Listing Rule*, 87 Fed. Reg. at 77375.

98.     OHV impacts have occurred in subpopulations 1, 4, 5, and 6. *Id.* On December 13, 2019, impacts from cross-country vehicle (truck or OHV) travel were observed within subpopulation 1 and adjacent to subpopulation 5. The Center submitted a report to BLM documenting these impacts. *See* Center for Biological Diversity, First Report re: OHV Travel through Tiehm's Buckwheat Habitat (undated). New vehicle tracks, human "social trails," and OHVs within Tiehm's buckwheat habitat continued to be observed after this report was sent, including on October 31, 2020, November 15, 2020,  March 2, 2021, April 13, 2021, May 7, 2021, May 18, 2021, May 29, 2021, July 16, 2021, September 11, 2021, September 24, 2021, and January 29, 2022. *See* Center for Biological Diversity, Second Report re: OHV Damage to Tiehm's Buckwheat Habitat (Nov. 16, 2020); Center for Biological Diversity, Third Report re: OHV Damage to Tiehm's Buckwheat Habitat (undated).

99.     Livestock impacts have been documented several times in and around Tiehm's buckwheat critical habitat, including in occupied habitat. Livestock grazing has many direct and indirect impacts on plant species including direct trampling, soil compaction, and disturbance that "can create conditions conducive to the invasion of non-native plant species." *Listing Rule*, 87 Fed. Reg. at 77375. Cattle grazing has also been shown to reduce the volume and average size of buckwheat plants. Listing Petition at 23.

100.     Cattle have frequently been spotted in the vicinity of Rhyolite Ridge, usually congregating around Cave Spring. On March 27, 2021, cattle sign (consisting of feces and hoofprints) was first observed in Tiehm's buckwheat habitat, within subpopulation 1. Additional cattle sign and trampling impacts were subsequently observed in occupied Tiehm's buckwheat habitat on April 18, 2021, December 28, 2021, May 2, 2022, August 11, 2022, January 3, 2023, January 20, 2023, February 4, 2023, and April 4, 2023. *See* Center for Biological Diversity Report re: Cattle Impacts to Tiehm's Buckwheat (Jan. 4, 2023); Center for Biological Diversity, 60-Day

Notice of Intent to Sue over Violations of the Endangered Species Act Regarding Impacts to Tiehm's Buckwheat from Authorized Livestock Grazing (Jan. 9, 2023).

101.   The severe impact of the 2020 herbivory event—which destroyed 60 precent of the total population—along with the impending existential threat of mine development, prompted FWS to list Tiehm's buckwheat as an endangered species in 2022.

102.   On July 22, 2020, FWS published a "90-day" finding pursuant to 16 U.S.C. § 1533(b)(3)(A) stating that the Center's October 29, 2019 listing petition presented substantial scientific or commercial information indicating listing may be warranted. U.S. Fish and Wildlife Service, *Threatened and Endangered Wildlife and Plants; 90-Day Findings for Two Species*, 85 Fed. Reg. 44265-66 (July 22, 2020). The 90-Day Finding stated that listing was warranted due to "the potential destruction of habitat from mining," as well as "invasive species, off-road vehicles, wildfires, climate change, and grazing." *Id.*

103.   Under the ESA, the Service must determine within 12 months after receiving a petition whether, based on the best available scientific and commercial information, listing is warranted. 16 U.S.C. § 1533(b)(3)(B). However, despite the imminent and existential nature of the threats cited in the listing petition and acknowledged in the 90-day finding, FWS did not make this required finding for Tiehm's buckwheat within the 12-month deadline. *See* Complaint, *Center for Biological Diversity v. Bernhardt*, No. 2:20-cv-01812-JCM-NJK (D. Nev., Sept. 29, 2020).

104.   On September 29, 2020, the Center filed suit in this Court to compel FWS to make the mandatory 12-month finding. *Id.* On April 21, 2021, this Court issued an Order declaring that FWS had violated the ESA and ordering FWS to prepare a 12-month finding within 30 days. Order, *Center for Biological Diversity v. Bernhardt*, No. 2:20-cv-01812-JCM-NJK, ECF 42 (D. Nev. April 21, 2021).

105.   On June 4, 2021, FWS issued a 12-month finding concluding that listing of Tiehm's buckwheat as an endangered species was warranted. U.S. Fish and Wildlife Service, *Endangered and Threatened Wildlife and Plants; Finding on a Petition To List the Tiehm's Buckwheat as Threatened or Endangered*, 87 Fed. Reg. 29975-77 (June 4, 2021). On October 7, 2021 FWS

published a proposed rule listing Tiehm's buckwheat as an endangered species, U.S. Fish and Wildlife Service, *Endangered and Threatened Wildlife and Plants; Endangered Species Status for Tiehm's Buckwheat*, 86 Fed. Reg. 55775-89 (Oct. 7, 2021), and on February 3, 2022, FWS issued a proposed critical habitat rule, U.S. Fish and Wildlife Service, *Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Tiehm's Buckwheat*, 87 Fed. Reg. 6101-16 (Feb. 3, 2022). FWS solicited public comment and peer review for the proposed listing and critical habitat rules.

106.    On December 16, 2022, FWS published a Final Rule listing Tiehm's buckwheat as an endangered species and designating 910 acres of critical habitat. *Listing Rule*, 87 Fed. Reg. 77368-401. FWS summarized its findings as follows:

> We find that Tiehm's buckwheat is in danger of extinction due to the present or threatened destruction, modification, or curtailment of its habitat or range including habitat loss and degradation due to mineral exploration and development, road development and OHV use, livestock grazing, and nonnative, invasive plant species . . . ; herbivory . . . ; and climate change. . . . Of these, we consider mineral exploration and development and herbivory to be the greatest threats to Tiehm's buckwheat. The existing [BLM and State] regulatory mechanisms . . . are inadequate to protect the species from these threats.

*Id.* at 77385-86.

107.    FWS's findings were based on a May 2022 Species Status Assessment (SSA). *See generally* SSA. FWS explained that the SSA "documents the results of [a] comprehensive biological review of the best scientific and commercial data regarding the status of the species, including an assessment of the potential threats to the species." *Listing Rule*, 87 Fed. Reg. at 77373. The SSA underwent peer review by three scientists "with expertise in botany, rare plant conservation, and plant ecology." *Id.* at 77369.

108.    The Final Listing rule explains that Tiehm's buckwheat's small population and highly restricted range place the species at a heightened risk of extinction, particularly in combination with the habitat fragmentation that frequently accompanies mining and other types of large-scale industrial development:

> Rare plant species, like Tiehm's buckwheat, that have restricted ranges, specialized habitat requirements, and limited recruitment and dispersal, have a higher risk of extinction due to demographic uncertainty and random environmental events . . . . Additionally, habitat fragmentation poses specific threats to species through genetic factors such as increases in genetic drift and inbreeding, together with a potential reduction in gene flow from neighboring individuals or subpopulations . . . . The effects of habitat fragmentation from the proposed Rhyolite Ridge lithium-boron project on Tiehm's buckwheat may be compounded by the inherently poor dispersal of the species and its specific soil requirements.

*Id.* at 77373-74.

109.    The Final Listing Rule considered an earlier (2022) version of the Mine Plan that, like the authorized Plan, would have avoided occupied Tiehm's buckwheat habitat but eliminated a substantial portion of the designated critical habitat (38 percent as opposed to the approved Plan's 22 percent). FWS found that even with the avoidance of direct impacts to occupied habitat, the 2022 Mine Plan posed an imminent and substantial extinction risk:

> To the east, subpopulations 3, 4, 5, 6, and 7 would be concerningly close to a 960-ft (293 m) deep open-pit quarry and when mining is complete, a terminal quarry lake . . . . In addition, over-burden storage facilities are proposed on the west side of subpopulations 3, 4, 5, 6, and 7 . . . . The combination of the quarry development and over-burden storage facilities are projected to disturb and remove up to 38 percent of critical habitat for this species, impacting pollinator populations, altering hydrology, removing soil, and risking subsidence.

*Id.* at 77375.

110.    The Final Listing Rule and SSA include a detailed analysis of potential impacts from mining. FWS considered four potential future scenarios: one "baseline" scenario in which the Project is not approved, two others that include approval of the Project with varying degrees of natural threats, and a fourth that includes approval of multiple mining projects. SSA at 7. FWS found that both "Project approval" scenarios would significantly increase the risk of extinction, though not to the same degree as the approval of multiple mining projects. *Id.*

111.    The Final Listing Rule noted that Subpopulation 6—which would be less than 200 feet from a waste rock dump under the approved Mine Plan—"may be the most resilient of the eight Tiehm's buckwheat subpopulations," and that loss of this population "may have an immense

impact on the overall resiliency and continued viability of the species, beyond just the loss of individuals . . . ." *Final Listing Rule*, 87 Fed. Reg. 77374.

112.    The Final Listing Rule also discussed the negative impacts of dust deposition from mining operations:

> Dust deposition, often a result of vehicle traffic on roads, negatively affects the physiological processes of plants including photosynthesis, reproduction, transpiration, water use efficiency, leaf hydraulic conductance, and stomatal disruption that impedes the ability of the stomata to open and close effectively . . . Physiological disruption to Tiehm's buckwheat individuals from dust generated from vehicular traffic associated with the proposed Rhyolite Ridge lithium-boron project would likely negatively affect the overall health and physiological processes of the population.

*Id.*

113.    FWS further acknowledged ongoing adverse impacts from livestock grazing, OHV use, and invasive species, *id.* at 77375-76, and noted that mine development could interact synergistically with these ongoing threats to increase the risk of extinction:

> Road development and vehicle traffic associated with the proposed mine as well as livestock grazing, which currently occurs within Tiehm's buckwheat population as part of BLM's Silver Peak allotment, may create conditions that further favor the establishment of nonnative, invasive species within Tiehm's buckwheat habitat. For example, Ioneer's Rhyolite Ridge lithium-boron project proposes to construct and operate a quarry, processing plant, overburden storage facility, spent ore storage facility, and access roads . . . . If the project is approved, and these ground-disturbing activities occur, there is a potential for increase in spread of nonnative, invasive plant species.

*Id.* at 77375-76.

114.    The Final Listing Rule concludes: "we find that the threat of mining continues to be of such magnitude that taken in combination with other threats described in this rule, Tiehm's buckwheat is in danger of extinction throughout all of its range." *Id.* at 77382.

115.    The Final Listing Rule designates 910 acres of critical habitat for Tiehm's buckwheat. FWS determined, based on the best scientific and commercial information available, that this designated critical habitat area contains the physical and biological features (PBFs) "necessary to the conservation of Tiehm's buckwheat." *Id.* at 77383.

116.    In identifying PBFs, FWS focuses on "specific features that are essential to support the life-history needs of the species." *Id.* at 77388. The Final Listing Rule identifies the following PBFs for Tiehm's buckwheat's critical habitat:

1. Plant community. A plant community that supports all life stages of Tiehm's buckwheat includes:

   a. Open to sparsely vegetated areas with low native plant cover and stature.

   b. An intact, native vegetation assemblage that can include, but is not limited to, shadscale saltbush, James' galleta, and alkali sacaton to protect Tiehm's buckwheat from nonnative, invasive plant species and provide the habitats needed by Tiehm's buckwheat's insect visitors and pollinators.

   c. A diversity of native plants whose blooming times overlap to provide insect visitors and pollinator species with flowers for foraging throughout the seasons and to provide nesting and egg-laying sites; appropriate nest materials; and sheltered, undisturbed habitat for hibernation and overwintering of pollinator species and insect visitors.

2. Pollinators and insect visitors. Sufficient pollinators and insect visitors, particularly bees, wasps, beetles, and flies, are present for the species' successful reproduction and seed production.

3. Hydrology. Hydrology that is suitable for Tiehm's buckwheat consists of dry, open, relatively barren, upland sites subject to occasional precipitation from rain and/or snow for seed germination.

4. Suitable soils. Soils that are suitable for Tiehm's buckwheat consist of:

   a. Soils with a high percentage (70–95 percent) of surface fragments that is classified as clayey, smectitic, calcareous, mesic Lithic Torriorthents; clayey-skeletal smectitic, mesic Typic Calcicargids; and clayey, smectitic, mesic Lithic Haplargids.

   b. Soils that have a thin ((0–5.5 in (0–14 cm)) A horizon, B horizons that are present as Bt (containing illuvial layer of lattice clays) or Bw (weathered), C horizons that are not always present, and soil depths to bedrock that range from 3.5 to 20 in (9 to 51 cm).

   c. Soils characterized by a variety of textures, and include gravelly clay loam, sand, clay, very gravelly silty clay, and gravelly loam.

   d. Soils with pH greater than 7.6 (i.e., alkaline) in all soil horizons.

> e. Soils that commonly have on average boron and bicarbonates present at higher levels, and potassium, zinc, sulfur, and magnesium present at lower levels.

*Id.* at 77390-91.

117.    FWS determined that a 500-meter buffer around occupied habitat was necessary to encompass all PBFs and maintain the plant-pollinator interactions that are essential for Tiehm's buckwheat's survival and recovery. *See id.* at 77383. While some public commentators attempted to downplay the importance of the local pollinator community and suggested that a more limited critical habitat designation was appropriate, FWS found these recommendations to be incompatible with the best available scientific information. As the Final Listing Rule explains:

> [W]e are using the best available nesting, egg-laying, and foraging information for bee, wasp, beetle, and fly pollinator and insect visitors of Tiehm's buckwheat to define the critical habitat boundary. Principles of conservation biology stress the importance of maintaining the largest areas of contiguous habitat possible with the least amount of fragmentation. We considered other boundary options for critical habitat; however, our boundary captures pollinator and insect visitor overlap among subpopulations as well as other PBFs necessary to the conservation of Tiehm's buckwheat.

*Id.* at 77384.

118.    FWS stressed that it was necessary to protect the unoccupied areas surrounding all Tiehm's buckwheat subpopulations in order to maintain plant-pollinator relationships because "most insect communities are known to be influenced not only by local habitat conditions, but also the surrounding landscape conditions." *Id.* at 77392.

119.    FWS also acknowledged that some areas outside the final critical habitat designation may be important to the conservation of Tiehm's buckwheat:

> Habitat is dynamic, and species may move from one area to another over time. We recognize that critical habitat designated at a particular point in time may not include all of the habitat areas that we may later determine are necessary for the recovery of the species. For these reasons, a critical habitat designation does not signal that habitat outside the designated area is unimportant or may not be needed for recovery of the species. Areas that are important to the conservation of the species, both inside and outside the critical habitat designation, may continue to be subject to: (1) Conservation actions implemented under section 7(a)(1) of the Act; (2) regulatory protections afforded by the requirement in section 7(a)(2) of the Act

for Federal agencies to ensure their actions are not likely to jeopardize the continued existence of any endangered or threatened species.

*Id*. at 77388.

120.    The Final Listing Rule and critical habitat designation found that offsite propagation and translocation were not viable conservation strategies for Tiehm's buckwheat, explaining that "we do not have any scientific evidence to support the theory that Tiehm's buckwheat has the ability to grow and persist at locations other than where it currently occurs." *Id.* at 77385.

121.    The Final Listing rule concluded with a list of activities that may be considered likely to destroy or adversely modify Tiehm's buckwheat's critical habitat:

> Activities that the Service may, during a consultation under section 7(a)(2) of the Act, consider likely to destroy or adversely modify the critical habitat of Tiehm's buckwheat include, but are not limited to, actions that are likely to cause large-scale habitat impacts, adversely affecting the PBFs at a scale and magnitude such that the designated critical habitat would no longer be able to provide for the conservation of the species. Examples include removing pollinator habitat and corridors for pollinator movement and seed dispersal; significantly disrupting the native vegetative assemblage, seed bank, or soil composition and structure; or significantly fragmenting the landscape and decreasing the resiliency and representation of the species throughout its range.

*Id.* at 77393.

## C.  The Project

### i.    *Permitting and Additional Exploration*

122.    A mere five days after FWS listed Tiehm's buckwheat and designated critical habitat, and despite the loss of 60% of the global population to herbivory and ongoing impacts from livestock and off-road vehicles, BLM officially began the NEPA process for the Rhyolite Ridge Mine by announcing a 30-day "scoping period" in the Federal Register. BLM, *Notice of Intent To Prepare an Environmental Impact Statement for Ioneer Rhyolite Ridge LLC's Proposed Rhyolite Ridge Lithium-Boron Mine Project, Esmeralda County, NV*, 87 Fed. Reg. 77879 (Dec. 20, 2022). BLM never considered whether the listing or Tiehm's buckwheat or the numerous

threats to the species impacted the suitability of the Rhyolite Ridge area for large-scale, open-pit mine development.

123.    BLM also authorized additional disturbance in Tiehm's buckwheat critical habitat. On December 26, 2022, visitors to Rhyolite Ridge discovered a significant new amount of mining-related activity including construction equipment, water trucks, and drill rigs. New roads had been bladed. While the majority of this activity was outside the Tiehm's buckwheat critical habitat, an equipment staging area was located within Tiehm's buckwheat critical habitat at the junction of Cave Springs Road and the road bisecting subpopulations 1 and 2, which contained a porta-potty, water bladder, truck, explosives storage, and a material laydown yard.

124.    This new disturbance was authorized by BLM as a "special use" under 43 C.F.R. Part 2920, not under the Mining Law, and as a result Plaintiffs were not notified of this new activity as required under the January 2020 settlement agreement with Ioneer discussed above. *See* Letter from the Center for Biological Diversity to BLM and FWS re: Unauthorized Use and Occupation of Bureau of Land Management Lands; Adverse Modification of Critical Habitat; and Unlawful Use of a Categorical Exclusion from the National Environmental Policy Act (Jan. 12, 2023). Plaintiffs documented this new disturbance and submitted a report to BLM. *See id.* BLM did not notify the public, conduct a full NEPA analysis, or enter into formal consultation with FWS regarding this new authorized disturbance. *Id.*

125.    In April 2024, BLM issued the Draft Environmental Impact Statement (DEIS) for the proposed mine in a confusing and disorganized manner. BLM issued a press release on Friday, April 12, 2024 stating that BLM was "seeking public comment on a draft environmental impact statement for the proposed Rhyolite Ridge Lithium-Boron Mine Project." Center for Biological Diversity et al., Comments on the Rhyolite Ridge Lithium-Boron Mine Draft EIS 12 (June 3, 2024) [hereinafter "DEIS Comments"]. The Press Release also stated that "[p]ublication of the draft EIS for the proposed mine opens a 45-day public comment period, ending on May 27, 2024." *Id.* However, BLM did not actually publish the DEIS on that date; nor did BLM issue the legally required notices in the Federal Register. *Id.* BLM then informed Plaintiffs that it would not publish

the Draft EIS for another week. However, four days later, on Tuesday, April 16, 2024 BLM surreptitiously posted the DEIS and certain supporting documents on its "eplanning" website with no additional public notification. *Id.* Again, BLM did not publish the federal register notice that is required to accompany a Draft EIS. Finally, on Friday, April 19th, 2024 BLM issued a federal register notice and changed its previously issued press release to state the correct comment deadline. *Id.*

126.    The Draft EIS described two alternative configurations for the proposed mine—the "Proposed Action" and the "North and South OSF Alternative." Bureau of Land Management, Rhyolite Ridge Lithium-Boron Project Draft Environmental Impact Statement (September 2024) [hereinafter, "DEIS"], at 2-1 to 2-21. Both alternatives would entail the dumping of waste rock, road construction, and the excavation of a mine pit within Tiehm's buckwheat's designated critical habitat. *Id.* The Proposed Action would eliminate 354 acres, or 38 percent of the species' total designated critical habitat, while the DEIS North and South OSF Alternative would eliminate 197 acres, or 22 percent of designated critical habitat. *Id.* Both alternatives would have similar—and significant—impacts on wildlife, groundwater resources, springs and wetlands, Native American cultural and spiritual values, environmental justice, and other resources. *See id.* at 4-1 to 4-76.

127.    BLM regularly provides the public up to 90 days to comment on a DEIS for a major mining project. *See, e.g.*, *See* BLM, Dear Reader Letter for the Mount Hope Project Draft Environmental Impact Statement, (November 29, 2011); BLM, Abstract, Draft Environmental Impact Statement for the Pan Mine Project (March 8, 2013). However, for the proposed mine, BLM provided just 45 days for the public to review and comment on the DEIS and its supporting reports and appendices, which together ran over 2,000 pages. Plaintiffs, as well as the Timbisha Shoshone Tribe and multiple other non-governmental organizations (NGOs) requested an extension of the 45-day comment period, but BLM denied all of these requests. *See* FEIS Appendix A, Public Comments and Responses.

128.    Despite the abbreviated comment period, Plaintiffs submitted extensive comments on the DEIS urging BLM to select neither the Proposed Action nor the North and South OSF

Alternative because either alternative would violate the ESA, FLPMA, and NEPA, and federal laws and policies concerning the protection of Native American cultural resources. *See generally* DEIS Comments. Plaintiffs' comments also included detailed analysis of the DEIS, Mine Plan, and Ioneer's proposed mitigation measures from subject-matter experts in rare plant conservation, hydrology, geology, mine engineering, and air pollution.

129.    Dr. Naomi Fraga, an expert in rare plant conservation at the California Botanic Garden, submitted comments on the DEIS and Ioneer's proposed "buckwheat protection plan." *See generally* Fraga 2024a. Dr. Fraga's report described the known habitat requirements of Tiehm's buckwheat, reviewed the results of relevant peer-reviewed publications, including a 2020 Ioneer-funded study by McClinton and others, and evaluated the Project's likely impacts on Tiehm's buckwheat and the efficacy of the proposed minimization and mitigation measures.

130.    Dr. Fraga noted that Tiehm's buckwheat is "at extreme risk of endangerment and extinction" due to its small population, limited range, and specialized habitat requirements. *Id.* at 6.

131.    Dr. Fraga found that Ioneer's proposed "direct avoidance" would not be effective in protecting Tiehm's buckwheat and the ecosystem it relies upon for survival due to the numerous indirect impacts from mining, including habitat loss and fragmentation, invasive species, impacts to pollinators and pollinator habitat, and dust deposition. *Id.* at 3-4.

132.    Dr. Fraga examined the threat of invasive species and reported that Ioneer's exploration activities have already resulted in the proliferation of the invasive species *H. glomeratus* throughout all subpopulations and designated critical habitat, in addition the establishment of several other invasives, including tumbleweed (*Salsola australis*) and pigweed amaranth (*Amaranthus albus*). *Id.* at 13. She further noted that reclamation efforts to date have been unsuccessful, and found that the proposed mitigation and minimization measures for invasive species could not be considered reliable or effective because a weed management plan had not been developed. *Id.* at 12.

133.    Dr. Fraga's report explained that dust deposition from mining operations has numerous adverse impacts on plant life, and that "[t]he Project has the potential to greatly increase the quantity and rates of dust deposition on plants of Tiehm's buckwheat from the construction of new facilities, use of access and haul roads, and blasting a 960 ft [pit] mere feet away from occupied habitat." *Id.* at 8-9. Dr. Fraga cited and discussed numerous studies on the impacts of dust deposition, including a 2007 study by Padgett and others involving a related species of buckwheat, which found that "plants growing within 1 [kilometer] of unprotected mining stockpiles were in degraded habitats and highly impacted by dust deposition." *Id.* at 8. She further explained that Ioneer's chosen dust deposition threshold of $4g/m^2/day$ was arbitrary and inappropriate because it was based on a study of a species with different physical characteristics, a different life-cycle, and different habitat requirements. *Id.* at 9. She explained that the DEIS and buckwheat protection plan failed to present information supporting the effectiveness and feasibility of the proposed dust minimization measures, and noted that the DEIS failed to consider the potential for these measures to accelerate the spread of invasive species. *Id.* at 9.

134.    Dr. Fraga's report examined the Project's impacts to pollinators and pollinator habitat and concluded that these impacts, in combination with the proposed mine's numerous other adverse impacts, posed an existential risk to Tiehm's buckwheat. *Id.* at 11-12. Dr. Fraga further explained that the proposed pollinator habitat reclamation could not be considered effective or reliable because: (1) a reclamation plan has not been developed, (2) Ioneer admits that "the reclaimed ecosystem is not expected to be similar to the undisturbed native ecosystem in critical habitat," (3) ecosystem restoration in arid environments is challenging, with high rates of failure, and (4) the proposed restoration methods are vague, experimental, and/or inappropriate for arid environments. *Id*. at 18-19.

135.    Finally, Dr. Fraga concluded that offsite propagation and translocation was not a viable conservation strategy for Tiehm's buckwheat.

136.    Dr. Michael C. McCarthy, an expert in air quality, land-use planning, and environmental analysis, submitted a report on the DEIS's analysis of dust deposition and the

proposed minimization measures. *See generally* Michael C. McCarthy, Ph.D., Review of Dust Deposition and Suppression Impacts on Tiehm's Buckwheat from the Rhyolite Ridge Lithium-Boron Project (May 31, 2024) [hereinafter, "McCarthy 2024a"]. Dr. McCarthy found that the DEIS and supporting documents underestimated dust deposition within Tiehm's buckwheat critical habitat because they relied on computer modeling that only included one source of fugitive dust—the haul road. The dust deposition modeling ignored emissions from other sources including pit blasting, pit excavation, waste rock loading and dumping, service roads, watering trucks, and wind erosion.

137.    In addition, Dr. McCarthy found that Ioneer and BLM made unfounded and unrealistic assumptions about the properties of the materials that would be used to build the Project's roads, further underestimating total dust emissions. Dr. McCarthy noted that the proposed mitigation and minimization measures would have indirect impacts on Tiehm's buckwheat and its critical habitat, including resuspension and deposition of various herbicides and chemical dust suppressants, and these impacts were entirely ignored in the DEIS. Finally, Dr. McCarthy found that the proposed dust minimization measures could not be considered feasible or effective because BLM and Ioneer had failed to account for the substantial amounts of water required (up to roughly 50 percent of the Project's total annual water budget), and failed to consider adverse environmental impacts from the proposed rates of water application.

138.    Dr. Steven H. Emerman submitted a report analyzing the stability of the mine pit and Ioneer's proposed monitoring and mitigation measures. *See generally* Steven H. Emerman, Ph.D., Assessment of the Operating and Post-Closure Stability of the Open Pit and the Proposed Ioneer Rhyolite Ridge Lithium-Boron Mine, Esmeralda County, Southwestern Nevada (May 26, 2024) [hereinafter "Emerman 2024a"]. Dr. Emerman found that the DEIS and supporting documents failed to articulate a factual basis for selecting a "factor of safety" of 1.2 during operations and 1.8 following closure. Dr. Emerman further explained that these factors of safety were insufficient compared with mining industry standards, and in light of the catastrophic consequences of pit-wall failure (the nearest Tiehm's buckwheat plant would be only 15 feet from

the edge of the pit). Dr. Emerman noted that information presented in the DEIS and supporting documents could not be considered reliable because BLM and Ioneer failed to account for substantial uncertainty in the data supporting their analysis. Dr. Emerman also explained that BLM and Ioneer had failed to disclose other important aspects of the pit wall design, including the overall probability of pit-wall failure and the size of the zone of geologic instability that would surround the pit. Dr. Emerman concluded that Ioneer's proposed monitoring and mitigation measures were inadequate because no plan had been developed and no specific mitigation measures had been proposed.

139.    In addition to these reports from subject-matter experts, BLM received a letter signed by over 100 scientists across the U.S., expressing concern that the Project as proposed would result in the extinction of Tiehm's buckwheat. The scientists' letter stated in part:

> The Mine will cause significant impacts up to and including the potential extinction of Tiehm's buckwheat . . . No mitigation measures will sufficiently address these impacts to appreciably reduce the risk of extinction.

> The pit, haul road, and waste rock dump would directly and irreparably destroy 22% of the designated critical habitat for Eriogonum tiehmii. This would result in a significant loss of pollinator habitat, which is essential for the conservation of *E. tiehmii*. However, the preferred alternative would in all actuality degrade the entirety of the critical habitat to the point that it would no longer support the conservation of *E. tiehmii*. The haul road and the wall of the open pit come within 15 feet of *E. tiehmii* populations. Putting mine infrastructure in such close proximity to the plant is putting it on a path to extinction.

> This magnitude of impact would compromise and fundamentally alter habitat integrity, pollination, and dispersal which is further exacerbated by the species' limited habitat availability (e.g. suitable soil) and inherent poor dispersal capabilities, ultimately affecting the long-term survival of the species.

Letter from Dr. Naomi Fraga, Dr. Peter H. Raven, Dr. Ben Grady, and others to the U.S. Bureau of Land Management, Battle Mountain District Office, re: Rhyolite Ridge Lithium-Boron Mine EIS and Impacts to Tiehm's buckwheat (June 3, 2024).

140.    Despite the significant issues raised in comments, BLM followed a highly accelerated schedule for mine permitting compared to other, similar projects on BLM lands in Nevada. According to internal BLM documents obtained by Plaintiffs through the Freedom of

Information Act (FOIA), BLM set a "very aggressive schedule" for mine permitting that "deviat[ed] from other project schedules on similar projects completed recently and concurrently" by the Battle Mountain BLM District and State BLM office. Email from Scott Distel, BLM, to Doug Furtado, BLM, re: Rhyolite Ridge Permitting (December 21, 2023). In order to meet the accelerated schedule for permitting, BLM:

> "Significantly change[d] timelines" for internal and inter-agency environmental review "without prior coordination with [the reviewing personnel]."
>
> Assumed, before receiving public comments, that such comments "are specific and provide direction on how to be resolved."
>
> Assumed that mitigation measures—many of which have yet to be developed— "do[] not require additional NEPA analysis or baseline [studies]."
>
> Assumed that forthcoming comments on the project from cooperating agencies would not be "significant" and would not "require new analysis or additional information to be incorporated."
>
> Assumed that "[n]o comments" would be received "that [require] input from BLM or Ioneer in responding to."
>
> Assumed that the DOI Solicitor's Office would "have no significant comments and do not require new analysis or additional information to be incorporated."
>
> Assumed that public comments would be "minimal," and that "no more than 100 individual comments" would be received.

*Id.*

141. On September 14, 2024, Plaintiffs discovered that Tiehm's buckwheat has recently suffered herbivory damage similar to the event of October 2021, which eliminated 60 percent of the total population. Damage has occurred to subpopulations 1-4, 5, and 6 with the vast majority of damage occurring in subpopulation 1. *See* Fraga 2024b, Appendix B. Approximately 30 percent of plants in subpopulation 1 have been damaged, and the damage is concentrated at lower elevations closest to a road that bisects the designated critical habitat between subpopulations 1 and 2. *Id.* Three distinct forms of damage have been observed: mechanical damage including removal of large portions of stems; digging and stripping of roots; and denuding of leaves at the

base of the stem. *Id.* Dr. Fraga surveyed the impacts on September 21, 2024 and estimates that the damage occurred in August 2024. *Id.*

142.    On September 19, 2024, BLM released the Final Environmental Impact Statement (FEIS) for the Project. The FEIS contains the same two Project alternatives as the DEIS—the Proposed Action and North and South OSF Alternative. The FEIS selects the North and South OSF Alternative as BLM's "preferred" alternative.

143.    The approved Project configuration requires Ioneer to obtain a "major modification" to the Project's water pollution control permit from the Nevada Department of Environmental Protection (NDEP). Ioneer has applied for, but has not received a major permit modification from NDEP. The Project also requires an updated air pollution control permit from NDEP, which Ioneer has not yet applied for.

144.    The FEIS includes a Final BiOp from FWS, dated September 4, 2024, concluding that the mine will not jeopardize the continued existence of Tiehm's buckwheat and will not adversely modify its critical habitat. *See generally* BiOp. FWS finalized the BiOp on September 4, 2024, less than a month after BLM began formal ESA consultation by submitting its Biological Assessment (BA). *Id.* The BiOp concludes that the Project will not destroy or adversely modify critical habitat for the same reasons as it reaches the "no jeopardy" conclusion. *See id.* at 56-62. The BiOp reaches its "no jeopardy" and "no adverse modification" conclusions despite considerable uncertainty as to the nature and extent of the Project's impacts on Tiehm's buckwheat.

145.    BLM made minimal changes to the Project design between the DEIS and Final EIS. *See generally* FEIS Appendix A: Public Comments and Responses. The North and South OSF Alternative presented in the FEIS retains the same components, in the same configuration, as the DEIS alternative, with the exception of the haul road, which was slightly re-routed but would still be located in Tiehm's buckwheat critical habitat in close proximity to subpopulation 3.

146.    BLM, FWS and Ioneer failed to consider or address the vast majority of the substantive comments Plaintiffs others submitted concerning the DEIS. For example, the FEIS and

BiOp: do not address Dr. Fraga's findings regarding invasive species in Tiehm's buckwheat habitat; do not consider do not consider or respond to Dr. Fraga's analysis showing that BLM selected an inappropriate and unsupported threshold for dust deposition; do not include details or specific plans regarding pollinator habitat reclamation; do not consider various indirect effects to pollinator habitat; do not do not explain BLM's rationale in selecting a factor of safety of 1.2; do not include a dust deposition analysis that considers all sources of fugitive dust; and do not consider the potential adverse impacts to Tiehm's buckwheat and its habitat from the proposed weed control dust suppression measures; and do not account for the large volumes of water that would be required for adequate dust suppression.

147.    Plaintiffs again submitted detailed comments on the FEIS, BiOp, and supporting documents. In addition, Drs. Fraga, McCarthy, and Emerman submitted responses to the FEIS and BiOp.

148.    Dr. Fraga noted that: the BiOp minimizes the magnitude of the invasive species threat, "leading to a minimized threat forecast . . . and an incorrect finding of no adverse impact"; several plans for minimization, mitigation, and reclamation, including an invasive species management plan, had still not been drafted and could therefore not be evaluated; the BiOp ignored the effects of habitat fragmentation and the cumulative impacts of various Project components; the BiOp failed to consider adverse impacts to pollinator habitat from water and herbicide application; and that the BiOp's analysis of impacts to pollinator habitat relied on unsubstantiated assumptions. *See generally* Fraga 2024b. Dr. Fraga's report included appendices documenting the current status of invasive species in Tiehm's buckwheat critical habitat and the impacts from the most recent herbivory event in in the summer of 2024. *Id.*

149.    Regarding invasive species, Dr. Fraga found that *Halogeton glomeratus* had equal to greater cover than Tiehm's buckwheat in all subpopulations, and had increased significantly throughout the species' since it was first observed in 2019. *See id.*, Appendix A.

150.    Dr. McCarthy reiterated his earlier points about the dust deposition analysis, as BLM and FWS provided no substantive response to his DEIS comments. *See generally* Michael

C. McCarthy, Ph.D., Review of Dust Deposition and Suppression Impacts on Tiehm's Buckwheat from the Rhyolite Ridge Lithium-Boron Project (Oct. 15, 2024) [hereinafter, "McCarthy 2024b"].

151.    Dr. Emerman's report likewise explained that BLM and FWS had provided no substantive response to his earlier comments and had not supplied a basis for the choice of a 1.2 factor of safety, accounted for uncertainty in the geologic data, or considered the probability of pit wall failure. *See generally* Letter from Steven H. Emerman, Ph.D. to Patrick Donnelly, Center for Biological Diversity re: Rhyolite Ridge Project (Oct. 11, 2024) [hereinafter, "Emerman 2024b"].

152.    On October 24, 2024, BLM issued the Project ROD. The ROD selects the North and South OSF Alternative and authorizes Ioneer to begin exploration and construction upon the approval of reclamation bonding.

153.    The ROD authorizes a "phased bonding" approach under which BLM will allow Ioneer to submit financial guarantees in successive stages for "specified activities," each of which must be individually reviewed and approved prior to authorization. The first activity that Ioneer will bond for is 35 acres of exploration. After Ioneer submits and BLM accepts an initial bond of $275,301, Ioneer will be authorized to commence surface-disturbing activity.

154.    While BLM was undertaking its purported objective review of the Project, on January 13, 2023, the U.S. Department of Energy granted a "conditional commitment to lend up to $700 million to Ioneer Rhyolite Ridge LLC to develop a domestic supply of lithium carbonate for electric vehicle (EV) batteries from the Rhyolite Ridge Lithium-Boron Project (Rhyolite Ridge) in Esmeralda County, Nevada."[2]

### ii.    *The Approved Project and its Environmental Impacts*

155.    The approved North and South OSF Alternative would disturb 2,266 acres within a 7,166 acre project area. BA at 3-1; FEIS at 2-18. Approximately 191 acres of Tiehm's buckwheat critical habitat would either be lost to the mine pit or buried under waste rock dumps. BA at 3-10.

---

[2] *See* https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-ioneer-rhyolite-ridge-advance-domestic-production (viewed October 28, 2024).

The Project also includes an access road and infrastructure route approximately 13 miles long that extends into Fish Lake Valley. BA at 3-1.

156.    The Project will proceed in three phases: construction, operation, and closure/reclamation. Construction will last approximately four years and require a workforce of approximately 400 to 500 persons working six 10-hour shifts per week. BA at 3-2, 3-4. This will require approximately eight to 14 daily trips by passenger busses to transport workers, in addition approximately 10 individual vehicles (pickups or passenger cars) for management personnel. *Id.* at 3-2.

157.    During the operations phase, the mine will operate 24 hours per day, 365 days per year, for 17-18 years. BA at 3-2; 3-4. Operations will require a workforce of approximately 350 persons. *Id.* at 3-2. During operations, busses carrying up to 30 passengers will transport workers to and from the Project site five to nine times per day. *Id.*

158.    Construction and operations, including the mine components located in Tiehm's buckwheat critical habitat, would utilize a variety of heavy equipment; as described in the Mine Plan of Operations (Mine Plan):

> Conventional, diesel-powered equipment (blast-hole drills, dozers, off-highway 40- and 150-ton haul trucks, and hydraulic shovel backhoe excavators/front end loaders) will be used for the Project. Dozers and graders will be used to maintain roads, growth media stockpiles, the OSFs, and the SOSF. Front-end loaders will be used in conjunction with crushers at the ore stockpile and crushing area located at the Processing Plant Area. Haul trucks/articulated dump trucks will be used to transport overburden, raw ore, spent ore, and processing solids. Water trucks will be utilized for road maintenance and dust control throughout the life of the Project. Utility vehicles will be used to access communication towers and other facilities as needed.

Ioneer Rhyolite Ridge LLC, Mine Plan of Operations/Nevada Reclamation Permit Application, Ioneer Rhyolite Ridge Lithium-Boron Project, Esmeralda County, Nevada, Revision No.7 (September 2024), [hereinafter "Plan" or "Mine Plan"] at 15.

159.    Additional equipment will be utilized during planned surface disturbance for exploration, dewatering, and water supply facilities, including drill rigs of various types (including

core, rotary, and hollow stem auger), backhoes for digging sumps, water trucks, tractor-trailers, light pickup trucks, and "other support vehicles as needed." *Id.*

160.    Roads will be constructed to and between major Project facilities. *Id.* at 24. Two primary types of roads will be constructed: service roads and haul roads. *Id.* Service roads will be constructed as a means to move equipment and supplies between the various Project components as well as to provide for light vehicle traffic. These service roads will be approximately 20 feet (nominal) wide plus shoulders. *Id.* Haul roads, constructed with a waste rock from the pit, will allow haul trucks to transport ore, overburden, and spent ore between the pit, processing facility, waste rock dumps, and tailings dump, with enough space incorporated into the design to allow for safe passage of two 150-ton haul trucks as well as sufficient room for safety berms and surface water runoff control systems. *Id.*

161.    In addition, Ioneer plans to realign two existing roads in the Project area, the Cave Springs Road and the Argentite Canyon Road. *Id.* at 24-25. The Cave Springs Road, also known as Cave Springs Road-Coyote Summit, is a public road currently maintained by Esmeralda County that bisects the Project area and runs through Tiehm's buckwheat critical habitat. *Id.* Approximately 4.7 miles of this road will be realigned, including the segment within critical habitat. *Id.*; BA at 3-24. Argentite Canyon Road is a public road currently maintained by Esmeralda County that intersects the Cave Springs Road and provides access through the southern portion of the Project Area. Plan at 25. This public road will require an approximately 0.9-mile realignment to accommodate the pit. *Id.*

162.    The mine pit will be 960 feet deep and span over 200 acres. Plan at 13. Part of the pit will be located in Tiehm's buckwheat critical habitat, *id.* and the edge of the pit will be only 15 feet from individual Tiehm's buckwheat plants in subpopulation 3. BiOp at 42.

163.    The pit will be excavated using explosives and heavy equipment. Plan at 14. Ioneer plans to remove approximately 25 million tons of lithium-boron ore and 406 million tons of waste rock from the pit—a total of 431 million tons of material. Plan at 14.

164.    The pit will require continuous dewatering once it reaches the water table at roughly 150 feet below the ground. *Id.* at 15. Dewatering wells will be located around the periphery of the pit, including in Tiehm's buckwheat critical habitat. BA at 3-16. Equipment that may be used for construction of dewatering facilities includes drill rigs of various types (including core, rotary, and hollow stem auger), backhoes for digging sumps, water trucks, tractor-trailers, light pickup trucks, and other support vehicles as needed. Plan at 15.

165.    After mining ceases, groundwater will seep into the pit from the surrounding groundwater aquifer and a pit lake will form. *Id.* at 67.

166.    The North and South OSF Alternative involves the construction of three waste rock dumps and a tailings dump. Plan at 16. Two of the waste rock dumps will be located in Tiehm's buckwheat critical habitat. The "South OSF" waste rock dump will occupy the southeastern portion of the designated critical habitat. *See id.* It will store approximately 120 million tons of waste rock and reach a maximum overall height of 1,030 feet. *Id.* The "Quarry Infill" waste rock dump will be located in the southern portion of the critical habitat adjacent to the South OSF. *Id.* It will contain 208 million of waste rock at a maximum overall height of 1,600 feet from the pit floor, or 300-640 feet above the ground. *Id.* at 16, 18.

167.    The "North OSF" waste rock dump will be located north of the pit, within 400 feet of designated critical habitat. *See* Plan at 16. The North OSF will store less waste than the South and Quarry Infill facilities (approximately 77 million tons), and reach a maximum overall height of 700 feet. *Id.*

168.    The footprints of the waste rock and tailings facilities will be cleared and graded prior to construction. BA at 3-20, Plan at 21. Runoff from the waste rock and tailings dumps will be collected in "contact water ponds." Plan at 17. The contact water pond for the "South OSF" waste rock dump would be adjacent to Tiehm's buckwheat critical habitat. *See* BA at 3-21 and Figure 2.

169.    Haul trucks will be used to transport lithium-boron ore to the processing facility, waste rock to the three waste rock dumps, and the spent materials from the processing plant to the

tailings dump. *Id.* at 3-11. During operations, 150-ton haul trucks will make up to 525 round trips per day on the haul road. FEIS at 4-31 Approximately 2,755 feet and 10 acres of haul road will occur within Tiehm's buckwheat designated critical habitat. BA at 3-13.

170.     Lithium-boron ore will be transported by truck from the pit to the processing facility where it will dumped into one of two temporary stockpiles: a high-lithium stockpile and high-boron stockpile. Plan at 19. It will then be crushed and fed into a "vat-leach" system, in which sulfuric acid will be used to remove lithium and boron. *Id.*; BA at 3-11. To supply sulfuric acid for the vat-leach process, the Project would include an on-site sulfuric acid manufacturing plant. Plan at 20. Residue from the "vat-leach" process will be dumped at the tailings facility. *Id.* at 19.

171.     The tailings facility will provide "permanent storage" for approximately 60 million tons of material, including spent ore and sulfate salts. *Id.* at 21. It would cover more than 370 acres and reach a maximum height of 250 feet. *Id.* Ioneer expects the tailings to contain elevated concentrations of salts, sulfate, fluoride, nitrogen, and various metals, including aluminum, magnesium, iron, and sodium. *Id.* Tailings are "expected to retain minor residual acidity in the materials," and "have the potential to release acidity and drain an acidic sulfate salt solution." *Id.* at 21.

172.     Electricity for the Project will be generated on-site using diesel generators and a steam turbine generator at the sulfuric acid plant. Plan at 25. Above-ground powerlines will be constructed to distribute power to the various Project facilities. *Id.*

173.     On an annual basis, the Project will consume: 81,943 tons of hydrated lime, 73,378 tons of soda ash, 12,450 tons of gypsum, 21.5 tons of sodium hydroxide, 1,381,000 tons of sulfuric acid, 120.3 tons of corrosion inhibitor, 300 tons of "biocides," 3 tons of antiscalant, 7.9 tons of liquid phosphate, 10 tons of oxygen scavenger, 473,916 tons of sulfur, and 4.7 million gallons of diesel fuel. Plan at 30. These materials will be delivered to the site by trucks using the Cave Springs road, which runs directly through Tiehm's buckwheat critical habitat. This will require approximately 75 to 100 truck trips per day. BA at 3-3. In addition, trucks transporting mine

products to customers throughout the U.S. and to the international market will make approximately 115 roundtrips to and from the Project site daily. Plan at 15.

174.    According to the FEIS and Mine Plan, the Project will use approximately 2,500 gallons of water per minute, or 4,035 acre-feet per year. Plan at 33. This total does not include the estimated 1,437 gallons per minute or 2,330 acre-feet per year that may be required for adequate dust suppression. *See* McCarthy 2024a.

175.    Some of the water used in mine operations will come from the pit dewatering wells, but additional water supplies will be required from Fish Lake Valley. Ioneer plans to lease existing agricultural water rights in Fish Lake Valley and pump water from Fish Lake Valley to the Project site through a 13-mile pipeline. Plan at 33. Under Nevada State law, in order for Ioneer to utilize this water, Ioneer must file, and the Nevada State Engineer must approve, an application to change the manner and place of use. NRS §§ 533.345; 533.370. The State Engineer has yet to approve any applications to change the place and manner of use for the water rights Ioneer intends to utilize; consequently, Ioneer currently does not have a legal right to use the water under State law. *See* Plan at 33.

176.    Ioneer has not requested a FLPMA Title V Right-of-Way (ROW) from BLM for the construction or operation of the water pipeline across public land.  BLM's Record of Decision approved the Project without a ROW for the water pipeline. *See also* FEIS Appendix C ("Major Permits and Approvals") (showing that a ROW for the water pipeline was not submitted, considered, or approved by BLM).

177.    Several ancillary structures and facilities will be required to support the daily operations of the mine. These facilities include: a dedicated mine maintenance shop with an adjacent warehouse; emergency response vehicle bay; security building; administration building; truck shop building including wash bay; an assay and metallurgical laboratory; autonomous truck calibration sites; fencing; five communications towers; laydown yards; bulk fluids storage; and fuel storage and distribution areas. Plan at 26.

178.    As noted, the FEIS and ROD also authorize up to 35 acres of mining exploration disturbance. "Exploration activities may consist of reverse circulation and core drilling from constructed drill sites with single or double sumps, constructed roads, overland travel routes, bulk sampling, geotechnical auger holes, and geological test pits." BA at 3-9. Some exploration may take place in Tiehm's buckwheat critical habitat. *Id.* The FEIS, ROD and BiOp do not contain an analysis of, or minimization or mitigation measures for, exploration impacts.

179.    Reclamation and closure will begin in year 18, and conclude in year 23, except for pollinator habitat reclamation in Tiehm' buckwheat critical habitat, which is expected to take up to 15 years. BA at 3-4. Apart from small, temporary, and "experimental" plots, pollinator habitat reclamation would not begin until year 19, after mining operations cease. BA at 3-8, 3-9.

180.    The operational phase of the Project may be extended if Ioneer discovers additional recoverable mineral deposits. Plan at 9 ("Ioneer will continue to evaluate the potential to extend the life-of-quarry beyond the currently planned operations as a result of planned exploration activities"). On information and belief, Ioneer is currently planning and conducting exploration activities in order to locate additional recoverable deposits.

181.    The Project facilities approved in the ROD would be located on 290 lode mining claims and 10 placer mining claims, except for the lands to be utilized by the 13-mile water pipeline and access corridor (which are not covered by any claims under the Mining Law).

182.    As stated in the Appendix A to the Mine Plan:

Fifteen of the subject lode claims (SLB 110 through SLB 115, and SLB 121 through SLB 129) and ten placer claims (SLP claims) are owned by Ioneer USA Corporation (Ioneer); the remaining 275 subject claims are owned by Ioneer Minerals Corporation. All claims owned by Ioneer Minerals Corporation and Ioneer USA Corporation are considered to be part of the Project.

183.    "Ioneer has also located and maintains mill site claims for the facilities relating to the mining operations including the overburden storage facility, spent ore storage facility, processing facility, and water ponds and diversions." *Id.*

184.    The mill site claims are located on the same land on which Ioneer USA and Ioneer Minerals Corp. have located and maintained their lode and placer mining claims.

185.    BLM has not determined whether the 290 lode mining claims, 10 placer mining claims, and millsite claims covering the Project area are valid and meet all requirements under the Mining Law, 30 U.S.C. §§ 21-54.

186.    BLM approved the Project under its 43 C.F.R. Part 3809 regulations, which only apply to "operations authorized by the [Mining Law] on public lands." 43 C.F.R. § 3809.2(a). However, BLM has not determined whether the various Project components (excepting initial exploration activities), such as the mine pit, waste rock dumps, tailings, haul roads, access roads, buildings, and storage facilities are located on valid mining and millsite claims, as required under the Mining Law. BLM has therefore failed to determine whether these facilities are "authorized by the mining laws."

187.    BLM reviewed and approved the Project under the belief that the Project was "authorized by the mining laws" and did not subject the Project to the agency's discretionary authority under FLPMA and its implementing regulations (such as 43 C.F.R. Part 2920).

188.    The two waste rock dumps (OSFs) and tailings facility (SOSF) will remain at the site in perpetuity and will not be removed at the conclusion of operations and site reclamation. Ioneer has no plans to remove those facilities. The FEIS and BiOp erroneously consider the disturbance from these and other Mine facilities to be "temporary."

189.    Several mine components will be located within or adjacent to Tiehm's buckwheat's critical habitat. The pit will be within critical habitat, 15 feet from subpopulation 3, 208 feet from subpopulation 5, and 558 feet from subpopulation 4. BiOp at 43. The "South OSF" waste rock dump will also be within critical habitat and 165 feet from subpopulation 6b, 256 feet from subpopulation 6a, 331 feet from subpopulation 5, 329 feet from subpopulation 4, and 492 feet from subpopulation 7. BiOp at 43. The "North OSF" waste rock dump will be within 400 feet of critical habitat. Approximately 2,755 feet and 10 acres of the haul road will occur within critical habitat, BA at 3-13, and the haul road will run within 138 feet of subpopulation 3, BiOp at 43.

Approximately 3,008 feet and 6.5 acres of the Cave Springs Road realignment will occur within critical habitat. BA at 3-14. One communication tower will be located 80 feet from critical habitat, and the access road for communication tower 4 will run through critical habitat in close proximity to subpopulations 1, 2, and 8. BA at 3-14. Six monitoring wells will be constructed within critical habitat, BA at 3-15, as will dewatering wells, sumps, drains, and pipelines for dewatering operations, *id*. at 3-15. The critical habitat areas not buried under waste rock or within the mine pit will be surrounded and bisected by fencing. BA at 16. A 10-foot berm will be constructed between the Cave Springs road and the haul road, and within critical habitat. *Id*. at 3-16. In total, this will require the long-term elimination of 191 acres of critical habitat.

190.    The BiOp does not assess, qualitatively or quantitatively, the impacts to Tiehm's buckwheat from the loss of 191 acres of adjacent pollinator habitat and the loss of PBFs previously deemed essential for the species' conservation. Rather, the BiOp postulates that the pollinator habitat is not unique, or of "heightened importance for maintaining pollinator diversity," BiOp at 52-53, and on that basis concludes that that the destruction of 191 acres of critical habitat will have no appreciable impact on Tiehm's buckwheat or the ecological processes it depends on. The BiOp disregards available scientific information regarding the importance of the designated critical habitat, including information suggesting that pollinator habitat in the eastern portion of the designated critical habitat, and pollinator habitat in the vicinity of subpopulation 6 (which would largely be covered by waste rock) may be of heightened importance to the species' conservation.

191.    The BiOp fails to consider various indirect impacts to pollinators and pollinator habitat from the Project, including but not limited to: dust deposition, invasive species, pollution from herbicide application and dust suppression, subsidence, and habitat fragmentation.

192.    The BiOp further assumes that pollinator habitat will be 100 percent successful, even though a pollinator habitat reclamation plan has not been developed or evaluated, and reclamation feasibility would depend on the results of unspecified experiments Ioneer intends to conduct during the Project's operational phase. *See, e.g*. BiOp at 56. The BiOp also ignores scientific information indicating that Ioneer will not be able to replicate the native pollinator

habitat community, reclamation in desert environments is challenging with low rates of success, and many of the proposed reclamation techniques are either novel and untested or ecologically inappropriate.

193. Beyond the physical destruction of 191 acres of critical habitat, the mine will have numerous indirect, but nevertheless significant, impacts on Tiehm's buckwheat. These include habitat fragmentation, impacts to pollinators, proliferation of invasive species, dust deposition, changes in hydrology, and habitat loss from pit-wall instability and subsidence. *See Final Listing Rule*, 87 Fed. Reg. at 77374-76; Fraga 2024a; Fraga 2024b. The Project will have many of the same impacts, at similar magnitudes, to the 2022 Mine Plan, which FWS found presented an existential threat when considered in combination with the environmental baseline. *See Final Listing Rule*, 87 Fed. Reg. at 77382.

194. The Mine will also impact water resources—and the ecosystems dependent on those water resources—within the Project area and across Fish Lake Valley. Dewatering from the mine pit will lower the water table in the Project area by up to 300 feet, and create an area of groundwater drawdown called a "cone of depression" that will extend for several miles. *See* FEIS at 4-40. Any springs connected to the groundwater aquifer within the cone of depression will likely suffer flow reductions or dry up entirely. *Id.* at 4-41. In addition to lowering the water table, mine dewatering will also intercept groundwater that flows into Fish Lake Valley, potentially harming groundwater-dependent wetlands. Tom Myers, Ph.D., Technical Memorandum re: Review of Rhyolite Ridge Draft Environmental Impact Statement 2 (June 1, 2024) [hereinafter, "Myers 2024a"].

195. The FEIS hypothesizes about certain springs being "perched," or separated from the groundwater aquifer, *id.* at 4, but also states that mitigation measures will be developed to address loss of springflow due to mining operations. *Id.* at 5; FEIS at 4-87. Although the FEIS attempts to minimize the potential for impacts to surface water resources, it concedes that any such impacts would be "permanent." FEIS at 4-41. Further, the proposed mitigation measures are not designed to preserve springflow or detect impacts before permanent harm occurs. *See* FEIS at 4-

87 to 4-88. As with many other resources, specific mitigation measures for water resources would be included in a monitoring and mitigation plan that has not been drafted or presented for public review. *See id.* at 4-87.

196. The Project could increase groundwater use in Fish Lake Valley, where the groundwater supply is already over-appropriated and over-pumped. The Nevada State Engineer's office uses the concept of "perennial yield" to identify a level of groundwater pumping that will not deplete the aquifer. The "perennial yield" of Fish Lake Valley is 30,000 acre-feet per year, roughly equal to the amount the area receives in "recharge" from precipitation. *See* FEIS at 3-20. However, this is probably an over-estimate, given that pumping at rates below 30,000 acre-feet per year have already depleted the aquifer. Current average pumping in Fish Lake Valley is 29,700 acre-feet per year, based on the last five years of pumping records available at the Nevada Division of Water Resources. Myers 2024a at 7. This level of pumping has caused groundwater levels in Fish Lake Valley to decline by up to 200 feet over the last 50 years. FEIS at 3-21.

197. Existing water rights holders in Fish Lake Valley are authorized to pump a total of 51,004 acre-feet annually. FEIS at 3-21. This limit exceeds the average annual pumping level over the five years by more than 21,000 acre-feet annually. *See id.*; Myers 2024a. It also exceeds Fish Lake Valley's estimated perennial yield by over 20,000 acre-feet annually. The difference between authorized pumping and actual pumping shows that a significant amount of Fish Lake Valley water rights are not currently in use.

198. If the water rights that Ioneer intends to acquire have not been used recently, then Ioneer's use would result in an increase in overall pumping. However, BLM and Ioneer did not determine whether the water rights Ioneer intends to acquire are currently being used for irrigation or other purposes, and thus failed to determine whether, and to what degree, the Project will increase water use in this over-appropriated groundwater basin. *See, e.g.*, FEIS at 4-41 ("[A]nalysis of pumping for water supply assumes the use of active water rights.").

199.    Between impacts from pit dewatering and impacts from pumping in Fish Lake Valley, the Project presents a substantial risk to groundwater dependent ecosystems in Fish Lake Valley, and the BLM-designated sensitive species that depend on those wetlands for habitat.

200.    Water in the pit lake will exceed State water quality standards, with elevated concentrations of arsenic, boron, fluoride, and molybdenum. FEIS at 4-42.

201.    Road and vehicle traffic from the proposed mine, in addition to construction of the pit, processing plant, waste rock dumps, tailings facility, haul roads, and access roads, would increase non-native, invasive species, which are already established in Tiehm's buckwheat habitat due to Ioneer's exploration projects. *See Final Listing Rule*, 87 Fed. Reg. at 77375-76.

202.    The BiOp and FEIS fail to consider that invasive weeds are already prevalent throughout the Tiehm's buckwheat's range and are likely adversely impacting the species. The BiOp and FEIS also fail consider the likelihood that the Project's tremendous increase in surface disturbance (over 2,000 acres in total), as well as increased vehicle traffic, will further accelerate the invasion of non-native plant species and imperil Tiehm's buckwheat.

203.    The FEIS and BiOp conclude that Tiehm's buckwheat will not be adversely affected by invasive species because Ioneer will implement a "noxious weed monitoring and control plan." *See, e.g.*, BiOp at 43; FEIS at 4-28. No weed monitoring or control plan was developed or released for public review prior to BLM's approval of the Project. BLM and FWS failed to consider the effectiveness or feasibility of the proposed weed-control and mitigation measures before approving the Project and issuing the "no jeopardy" BiOp.

204.    Dust deposition is known to have a significant impact on plant health and abundance. The Final Listing Rule explains:

> Dust deposition . . . negatively affects the physiological processes of plants including photosynthesis, reproduction, transpiration, water use efficiency, leaf hydraulic conductance, and stomatal disruption that impedes the ability of the stomata to open and close effectively.

87 Fed. Reg. at 77375. The Final Listing Rule concludes that dust generated by the Project "would likely negatively affect the overall health and physiological processes of the population." *Id.*

205.    The Project would create numerous sources of fugitive dust, including but not limited to pit blasting, pit excavation, waste rock loading and dumping, service roads, watering trucks, and wind erosion.

206.    The Project will likely generate 2,900 tons of particulate matter emissions per year, with fugitive dust making up the vast majority of these emissions. McCarthy 2024a at 3. However, as explained below, this is likely an underestimate.

207.    The FEIS and BiOp rely on dust deposition modeling performed by Ioneer's consultants to assert that dust deposition will not substantially affect Tiehm's buckwheat or the quality of its critical habitat. However, the modeling provided by Ioneer underestimates total dust deposition because it only models fugitive dust from one potential source—the haul road. BA at 3-3; McCarthy 2024a; McCarthy 2024b. The model ignores dust emissions from numerous other significant sources, including pit blasting, pit excavation, waste rock loading and unloading, road construction and realignment, service roads, water trucks, workforce transportation, materials and products transportation, and wind erosion from the waste rock stockpiles. *See* BA at 3-3 ("This analysis did not include other vehicular traffic from the work force, nor other sources of potential particulate emissions from Action operations, only particulate emissions from the haul road and haul truck traffic."); *see also* McCarthy 2024a at 3-4.

208.    BLM and FWS failed to respond to McCarthy's (2024a, 20242b) analysis showing that dust deposition from the Project was significantly under-estimated.

209.    The BiOp, FEIS and Mine Plan set an arbitrary threshold of $4g/m^2/day$ for dust deposition, based on studies of a species with a vastly different physiology, life-cycle, and habitat. BLM and FWS failed to consider or respond to Fraga's (2024a, 2024b) analysis showing that this threshold did not have a reasonable scientific basis and more relevant studies were available.

210.    Ioneer also performed an Air Quality Impact Analysis, but because this analysis was designed to assess compliance with State and Federal ambient air quality standards, it "did not include an analysis of impacts from potential deposition of [particulate matter] from these sources relative to Tiehm's buckwheat subpopulation and Tiehm's buckwheat designated critical

habitat." BA at 3-4. The FEIS and BiOp supply no factual basis on which to conclude that ambient air quality standards are an appropriate proxy for dust impacts to Tiehm's buckwheat and its critical habitat.

211.    The BiOp acknowledges considerable uncertainty as to the nature and degree of impacts from to dust deposition. *See, e.g.*, BiOp at 48 (stating that it is "difficult to estimate the probability and magnitude" of dust impacts); *id.* (stating that FWS "cannot predict the extent of dust exposure to pollinators"). However, the BiOp ultimately disregards this information and concludes, based on the anticipated future development of a dust monitoring plan, that fugitive dust will have no appreciable impact on the species and its critical habitat.

212.    Ioneer and BLM also failed to consider impacts from the proposed dust mitigation measures, including pollution from the herbicides and chemical dust suppressants, McCarthy 2024a at 4-9, and the acceleration of invasive species proliferation due to water application. *See* Fraga 2024a, 2024b.

213.    The FEIS fails to account for the tremendous water demands from Ioneer's proposed dust control measures. Ioneer has stated that it intends to achieve a "control efficiency" for fugitive dust of up to 95 percent (however, this does not appear to be a requirement under the 2024 Mine Plan, FEIS, ROD, and BiOp). This would require 50,000 gallons of water per hour, just for dust suppression on the haul road—it does not include the water that would be required for dust suppression required for the quarry excavation, overburden storage, ore crushing, service roads, or other dust-generating mine components.

214.    As noted, dust-suppression water is not included in the Project's total estimated daily use of 2,500 gallons per minute/4,035 acre-feet per year, and achieving Ioneer's dust-suppression goals for just the haul road would add approximately 1,437 gallons per minute or 2,330 acre-feet per year to the Project's total water demand. McCarthy 2024a. The FEIS and BiOp ignore the impacts of this additional water consumption and application entirely. Ioneer and BLM did not determine whether the proposed dust suppression measures are practicable or feasible given the large volumes of water required. Nor did BLM and Ioneer consider other environmental

impacts from the proposed dust control measures, including structural impacts to the affected roads, invasive species proliferation, and impacts to Tiehm's buckwheat critical habitat from water application.

215.    Mine-pit slope failures are incredibly common compared to other types of industrial accidents, Emerman 2024a at 3, and under the North and South OSF alternative approved in the ROD, Tiehm's buckwheat subpopulation 3 will be 15 feet from the edge of the pit. BiOp at 42. Slope instability as a result of the Project therefore presents a short- and long-term threat to Tiehm's buckwheat.

216.    The FEIS, Biological Assessment, and BiOp assert that pit-wall instability poses no appreciable risk to Tiehm's buckwheat because, according to reports produced by Ioneer's consultants, the pit will be designed to meet a minimum factor of safety of 1.2. Plan at 14. The FEIS, Biological Assessment, and BiOp do not explain what a factor of safety is, or why a factor of safety of 1.2 was selected.[3] Nor do they consider whether a Factor of Safety of 1.2 is adequate to protect Tiehm's buckwheat over the long-term (*i.e.* 23 years of mining operations). BLM and Ioneer did not provide data analysis to support the selected factor of safety.

217.    BLM's slope stability analysis fails to support its conclusions with reliable information, fails to divulge or consider uncertainty in the underlying geotechnical data, fails to consider post-closure instability in the areas surrounding the pit, and does not consider how the saturation of the pit wall from groundwater flow and/or the formation of the pit lake would impact stability.

218.    To address the potential for pit-wall failure, the BA, BiOp, FEIS, and Mine Plan state that Ioneer will develop a "geotechnical slope monitoring plan" at some point in the future.

---

[3] Emerman (2024a) explains that a factor of safety is the ratio of resistance to load, and represents the likelihood of structural failure. A factor of safety of 1.0 indicates a slope at the cusp of failure, or 50% probability of failure. *Id*. The FEIS and BiOp do not disclose the likelihood of failure at a factor of safety of 1.2.

*See* BiOp at 15; BA at 3-30; FEIS at 3-30. No geotechnical monitoring plan has been developed or presented for public review.

219.    The FEIS and BiOp fail to adequately consider adverse impacts to Tiehm's buckwheat and other sensitive resources from ground subsidence. Dewatering can cause subsidence as the groundwater that partially supports the overlaying rock and soil layers is removed. *See* BA at 8-21. The greatest effects on plant life from subsidence have been observed on "sparsely vegetat[ed] areas," like the areas in which Tiehm's buckwheat and its occur pollinator community. *See id.*

220.    The FEIS and BiOp do not provide support for their conclusions that no or minimal subsidence will occur. Supporting documentation for the DEIS and FEIS predicted up to 10 inches of subsidence based on subsidence rates at other dewatering operations in Nevada. *See* FEIS at 4-21. Further the BA cites and discusses studies showing adverse impacts to plant species from subsidence, including effects to photosynthesis, soil chemistry, and overall plant health, but arbitrary concludes that none of these studies are applicable to the Project. *See* BA at 8-21 to 8-23. The BiOp reaches its "no or minimal impact" conclusion even though it admits that the "effects of subsidence are not well studied" with respect to Tiehm's buckwheat, and FWS "cannot determine how [Tiehm's buckwheat] critical habitat will respond" to the anticipated amount of subsidence. BiOp at 62.

221.    The BiOp fails to consider the effects of the project in combination with ongoing threats that are part of the environmental baseline including but not limited to: (1) the species' low population, highly restricted range, and specialized habitat requirements; (2) ongoing impacts from herbivory; (3) and invasive species. The BiOp acknowledges the general principle that species with small populations are more vulnerable to extirpation and extinction, BiOp at 32, but does not apply this knowledge in its analysis of the effects of the action on Tiehm's buckwheat, *see id.* at 40-62. It does not consider the effects of the action, including habitat fragmentation, habitat degradation, air pollution, and destruction of pollinator habitat in combination with the species' already precarious baseline.

222.    The BiOp fails to identify the conditions necessary for Tiehm's buckwheat's survival and recovery. Although the BiOp acknowledges that the Project will increase numerous threats to the species, including habitat fragmentation, invasive species, pollinator habitat destruction, dust deposition, pit wall instability, and others, it fails to identify a point at which these threats, either singularly or in combination, would jeopardize the survival and recovery of Tiehm's buckwheat or adversely modify critical habitat. For example, the BiOp fails to: identify a point at which habitat fragmentation would disrupt essential ecological processes; identify a point at which invasive species would compromise the species' viability; identify a point at which pollinator habitat destruction would impact the species' reproductive processes; identify a point at which dust deposition would have adverse impacts on Tiehm's buckwheat individuals or pollinator habitat; and supply a factual basis for its assertion that a factor of safety of 1.2 is sufficient to protect Tiehm's buckwheat.

223.    Except for a general statement that the Project will make on-site conservation more difficult, the BiOp does not consider the Project's impacts on Tiehm's buckwheat recovery. The BiOp arbitrarily, capriciously, and unlawfully relies for its conclusion concerning recovery on an experimental offsite propagation and translocation program that has not yet been developed. *See* BiOp at 55. Nevertheless, the BiOp acknowledges that "it is unclear if the program will ultimately be successful in in moving the species' status closer to recovery." BiOp at 55.

224.    To purportedly minimize or mitigate adverse impacts to vegetation, groundwater, wildlife habitat, ESA-listed species, and other resources, the FEIS, ROD, and BiOp rely on as-yet-undefined future monitoring mitigation plans that will not be subject to public and agency review under NEPA and FLPMA. For example, several documents regarding specific protocols and procedures are detailed in the "Buckwheat Protection Plan" have yet to be developed or reviewed and approved by BLM and FWS. These include:

- Geotechnical Slope Management and Monitoring Plan
- Native Seed Collection and Propagation Protocols
- Pollinator Habitat Reclamation Study Plan

- Pollinator Habitat Reclamation Plan
- Noxious and Invasive Weed Monitoring and Management Plan
- Light Monitoring Plan
- Dust Monitoring Plan
- Study to Refine Trigger Thresholds for Dust Deposition on Tiehm's Buckwheat
- Tiehm's Buckwheat Demographic and Recruitment Monitoring Protocols and Procedures
- Tiehm's Buckwheat Environmental Awareness Training Plan(s)
- Stormwater Management, Monitoring and Reporting Plan
- Critical Habitat Monitoring Plan
- Insect Visitor and Pollinator Monitoring Plan
- Noise Monitoring Plan

BA at 3-29 to 3-37.

225.    The conservation, minimization, and mitigation measures cited in the FEIS and BiOp are overly generalized, vague, discretionary, unenforceable, not reasonably certain to occur, and frequently do not require BLM or Ioneer to take any specific conservation, minimization, or mitigation actions.

## CLAIMS FOR RELIEF

### First Claim for Relief: Violation of the ESA and APA; Arbitrary, Capricious, and Unlawful BiOp

226.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

227.    FWS's September 4, 2024 BiOp for the Project is unlawful under the ESA, and Arbitrary and Capricious under the APA, for the following reasons:

a.   The BiOp fails to consider the Project's impacts in combination with the environmental baseline and status of Tiehm's buckwheat;

b.   The BiOp fails to utilize the best available scientific and commercial information;

c.  The BiOp fails to identify conditions necessary for Tiehm's buckwheat's survival and recovery;

d.  The BiOp fails to consider or analyze the Project's impacts on Tiehm's buckwheat's recovery;

e.  The BiOp's jeopardy and adverse modification determinations rely on conservation, minimization, and mitigation measures that are generalized, vague, discretionary, insufficiently developed, not available for public or agency review, unenforceable, and/or not reasonably certain to occur;

f.  The BiOp arbitrarily and unreasonably makes its adverse modification determination based on the same rationale as the jeopardy determination;

g.  The BiOp fails to ensure that the Project will not jeopardize the continued existence of Tiehm's buckwheat or adversely modify its critical habitat;

h.  The BiOp fails to consider all relevant factors in making its jeopardy and adverse modification determinations for Tiehm's buckwheat;

i.  The BiOp fails to articulate a rational connection between the facts found and the choices made in making its jeopardy and adverse modification determinations for Tiehm's buckwheat.

228.  FWS violated the ESA in preparing, issuing, and approving the 2020 BiOp. 16 U.S.C. § 1536; 50 C.F.R. § 402.14. The 2020 BiOp is arbitrary, capricious, an abuse of discretion, not in accordance with the ESA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The 2020 BiOp should be held unlawful, vacated, set aside, and remanded to FWS. *Id.*

Second Claim for Relief: Violation of FLPMA and the APA; Failure to Prevent UUD

229.  Plaintiffs hereby incorporate by reference all preceding paragraphs.

230.  BLM's approval of the Project is unlawful under FLPMA, 43 U.S.C. §§ 1701 *et seq.*, and arbitrary and capricious under the APA because BLM failed to prevent unnecessary and

undue degradation of the public lands. 43 U.S.C. § 1732(b). Specifically, BLM failed to: prevent adverse impacts to Tiehm's buckwheat, an endangered species, and its habitat, 43 C.F.R. § 6101.4(aa); *id.* § 3809.420(b)(7), failed to ensure that the Project complies with all applicable Federal and State environmental protection laws, 43 C.F.R. § 3809.5; 43 C.F.R. § 3809.420(b)(4); and failed to conduct an adequate analysis under NEPA.

231.    BLM violated FLPMA in reviewing, issuing, and approving the FEIS and ROD. 43 U.S.C. § 1732(b). The FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

Third Claim for Relief: Violation of FLPMA; Failure to Permit Mine Operations Under the Correct Permitting Regime

232.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

233.    BLM failed to issue a FLPMA-compliant right-of-way for the water pipeline and access corridor.

234.    Instead of requiring a ROW (Special Use Permit) for the water supply pipeline, the agency relied upon its definition of "operations" in its Part 3809 mining regulations. 43 C.F.R. §3809.5. Yet water pipelines and other conveyances cannot be authorized by the plan of operations approval process, which only involve "operations authorized by the mining laws." 43 C.F.R. §3809.1(a). Approval of water pipelines is not governed by any right under the Mining Law.

235.    The agency's decision to consider pipelines, etc. as mineral "operations" that it must approve under Part 3809 erroneously eliminates the agency's duties under FLPMA and creates statutory rights where none exist. BLM thus failed to apply the proper environmental and public interest reviews under FLPMA Title V and its implementing regulations.

236.    BLM violated FLPMA in reviewing, issuing, and approving the FEIS and ROD. The FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with

FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

Fourth Claim for Relief: Violation of FLPMA; Violation of Governing RMP

237.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

238.    The ROD, FEIS and Project approvals violate the Tonopah RMP's special status species requirements and FLPMA.

239.    BLM failed to ensure that the Project complies with the Tonopah RMP. Instead, BLM based its review and approval of the Project on an erroneous legal assumption that Ioneer had statutory rights to conduct all of their proposed operations, including the permanent use and occupation of public lands for the mine pit, waste rock and tailings dumps, without the necessary factual evidence to support the establishment of those rights, thus failing to properly review and regulate the Project under FLPMA to protect public resources and the public interest, in violation of FLPMA and its implementing regulations.

240.    BLM violated FLPMA in reviewing, issuing, and approving the FEIS and ROD. The FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

Fifth Claim for Relief: Violation of FLPMA and NEPA; Failure to Determine Whether Ioneer's Mining and Millsite Claims are Valid and Failure to Properly Exercise Authority Over the Project

241.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

242.    BLM has not determined whether the 290 lode mining claims, 10 placer mining claims, and millsite claims covering the Project area are valid under the Mining Law, 30 U.S.C. §§ 22-42.

243.    Without a determination that all mining and millsite claims used by the Project are valid and meet all requirements under the Mining Law, activities conducted on these claims are not "operations authorized by the mining laws" 43 C.F.R. §3809.1(a), and do not have any statutory rights under the Mining Law.

244.    BLM based its review and approval of the Project on an erroneous legal assumption that Ioneer had statutory "valid existing rights" to conduct all of their proposed operations, including the permanent use and occupation of public lands for the waste rock and tailings dumps, without the necessary factual evidence to support the establishment of those rights, thus failing to properly review and regulate the Project under FLPMA to protect public resources and the public interest, in violation of FLPMA, NEPA, and their implementing regulations.

245.    BLM violated FLPMA and NEPA in reviewing, issuing, and approving the FEIS and ROD. The FEIS and ROD is arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA or NEPA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

### Sixth Claim for Relief: Violation of NEPA and FLPMA; Failure to Adequately Analyze Mitigation Measures and Their Effectiveness

246.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

247.    In the ROD and FEIS, BLM failed to adequately and accurately analyze mitigation measures, and the effectiveness of those measures, as required by NEPA and FLPMA.

248.    BLM's actions and omissions noted above regarding its review and approval of the Project, violate NEPA, FLPMA and their implementing regulations. The FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA or NEPA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

<u>Seventh Claim for Relief: Violation of NEPA and FLPMA; Failure to Adequately Analyze Direct, Indirect, and Cumulative Impacts.</u>

249.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

250.    In the FEIS and ROD, BLM failed to take the required "hard look" at the Project and its impacts, and failed to adequately and accurately analyze the Project's direct, indirect and cumulative impacts to threatened and endangered species, sensitive species, other wildlife, air and water resources, cultural resources, environmental justice, and all other potentially affected resources, as required by NEPA and FLPMA.

251.    The FEIS and ROD also failed to "state how alternatives considered in them and decisions based on them will or will not achieve the requirements of sections 101 and 102(1) of NEPA," NEPA implementing regulations, and "other environmental laws and policies." 40 C.F.R. §1502.2(d).

252.    BLM's actions and omissions noted above regarding its review and approval of the Project violate NEPA, FLPMA, and their implementing regulations. The FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA or FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. 5 U.S.C. § 706(2)(A). The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

<u>Eighth Claim for Relief: Violation of NEPA and FLPMA; Failure to Analyze Background/Baseline Conditions.</u>

253.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

254.    In the FEIS and ROD, BLM failed to adequately and accurately analyze the background/baseline conditions of resources that will be potentially affected by the Project, including but not limited to: threatened and endangered species, sensitive species, other wildlife, water quality, water quantity, and air quality, as required by NEPA and FLPMA.

255.    BLM's actions and omissions noted above regarding its review and approval of the Project, violate NEPA, FLPMA, and their implementing regulations. The FEIS and ROD are

arbitrary, capricious, an abuse of discretion, not in accordance with NEPA or FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706. The FEIS and ROD should be held unlawful, set aside, vacated, and remanded to BLM. *Id.*

Ninth Claim for Relief: Violation of the ESA; Reliance on Unlawfully Issued Biological Opinion

256.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

257.    FWS's September 4, 2024 BiOp for the Project is unlawful under the ESA, and Arbitrary and Capricious under the APA. Defendant BLM's reliance on the September 4, 2024 BiOp in issuing authorizing, and approving the Project is therefore contrary to the ESA, 16 U.S.C. § 1536(a)(2).

258.    Because the September 4, 2024 BiOp is unlawful, Defendant BLM is in ongoing violation of its affirmative and substantive duty, as the action agency, to insure that the authorization and implementation of the Project is not likely to jeopardize the continued existence of any threatened or endangered species, and is not likely to result in the destruction or adverse modification of designated critical habitat. *Id.* BLM cannot meet its obligations under ESA Section 7(a)(2) by relying on a BiOp that is substantively and procedurally deficient. *Id.*

259.    The ROD, insofar as it relies on the September 4, 2024 BiOp, violates the ESA, *id.*, and is arbitrary, capricious, an abuse of discretion, not in accordance with the ESA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations 5 U.S.C. § 706(2)(A). *Id.* BLM must be enjoined from relying on the September 4, 2024 BiOp and implementing the ROD pursuant to the ESA, 16 U.S.C. § 1540(g)(1)(A).

Tenth Claim for Relief: Violation of the ESA; Failure to Utilize Action Agency Authority to Further the Conservation of Tiehm's Buckwheat

260.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

261.    BLM has violated its affirmative duty to "conserve" ESA-listed species by failing to implement an effective program to conserve Tiehm's buckwheat.

262.    As a federal agency, BLM has an affirmative duty to "conserve" threatened and endangered species. 16 U.S.C. § 1536(a)(1). This is not an abstract or generalized duty; instead, the plain language of the ESA requires the BLM to take whatever actions are required to ensure the survival and recovery of each listed species. *Id.* §§ 1532(3) (defining conservation to include recovery), 1536(a)(1) (agencies have affirmative duty to work towards conservation of species). BLM must prioritize the conservation species listed as threatened or endangered even above its own primary mission. *Tenn. Valley Auth.*, 437 U.S. at 185.

263.    Insignificant measures that do not or are not reasonably likely to conserve endangered species fail to satisfy federal agencies' Section 7(a)(1) obligations. *See Florida Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418-19 (9th Cir. 1990).

264.    BLM has failed to take affirmative action to conserve Tiehm's buckwheat. Instead of prioritizing the conservation of this endangered species, as the ESA requires, BLM has allowed and/or authorized various actions that, individually and collectively, further imperil Tiehm's buckwheat's survival and recovery. These actions include, but are not limited to: mining exploration, off-highway vehicle use, livestock grazing, and approval of the Rhyolite Ridge project, which would eliminate over 20% of Tiehm's buckwheat's critical habitat and expose all known subpopulations to various adverse indirect effects from mine construction and operations.

265.    BLM has not, and is not utilizing its authorities in furtherance of the purposes of the ESA by carrying out programs to conserve Tiehm's buckwheat because BLM is not using methods or procedures to bring the Tiehm's buckwheat to the point at which protection under the ESA will no longer be necessary. Rather, BLM's actions have significantly increased and exacerbated the threats that Tiehm's buckwheat faces throughout its range.

266.    BLM has failed to place top priority on the survival and recovery of Tiehm's buckwheat, as required under the ESA. *Tenn. Valley Auth.*, 437 U.S. at 185.

267.    BLM's failure to implement any effective programs to further the survival and recovery of Tiehm's buckwheat, and its decisions to instead authorize or allow actions that have

been found to harm Tiehm's buckwheat and its designated critical habitat, violate the ESA, 16 U.S.C. § 1536, and are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA or FLPMA, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(A). Alternatively, BLM's failure to implement any effective programs to further the survival and recovery of Tiehm's buckwheat constitutes agency action unlawfully withheld or unreasonably delayed. *Id.* § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that FWS's September 4, 2024 BiOp is arbitrary, capricious, and contrary to the ESA;

B.    Declare that BLM's reliance on the September 4, 2024 BiOp to approve the Project is arbitrary, capricious, and contrary to the ESA;

C.    Declare that BLM's actions, omissions, and decisions regarding Tiehm's buckwheat and its designated critical habitat, including but not limited to its approval of the Project, violate its affirmative conservation duty under ESA Section 7(a)(1);

D.    Declare that BLM's actions, omissions, and decisions in reviewing and approving the Rhyolite Ridge Project (including the mine and exploration projects) and related actions violate NEPA, FLPMA, and their implementing regulations;

E.    Pursuant to the APA, vacate the ROD, BiOp, FEIS, and Project approvals;

F.    Enjoin any further implementation of the Project;

G.    Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H.    Grant Plaintiffs such further relief as may be just, proper, and equitable.

Dated January 10 , 2025                              Respectfully submitted,

                                                    */s/ Scott Lake*
                                                    Scott Lake
                                                    Center for Biological Diversity
                                                    P.O. Box 6205
                                                    Reno, NV 89513
                                                    (802) 299-7495
                                                    slake@biologicaldiversity.org


                                                    */s/ Roger Flynn*
                                                    Roger Flynn
                                                    Western Mining Action Project
                                                    P.O. Box 349, 440 Main Street, #2
                                                    Lyons, CO 80540
                                                    (303) 823-5738
                                                    roger@wmaplaw.org
                                                    (*pro hac vice*)

                                                    *Attorneys for Plaintiffs*