UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Center for Biological Diversity, et al., | Case No. 2:24-cv-02043-CDS-NJK |
| Plaintiffs | **Order Denying Plaintiffs' Motion for Summary Judgment, Granting Defendants' Cross-Motion for Summary Judgment, and Granting Plaintiffs' Motion for Leave to File Supplemental Authority** |
| v. | |
| Tracy Stone-Manning, et al., | |
| Defendants | [ECF Nos. 37, 43, 52] |

This case challenges the federal government's approval of the Ryholite Ridge Lithium/Boron Mine Project—an open-pit mining project on public lands located in Nevada's Silver Peak Range. Am. compl., ECF No. 19-1. The Center for Biological Diversity, the Great Basin Resource Watch, and the Western Shoshone Defense Project filed this suit for vacatur and equitable, declaratory, and injunctive relief under the Endangered Species Act (ESA), the Administrative Procedure Act (APA), and the National Environmental Policy Act (NEPA). *Id.* They seek such relief against several government officials,[1] the Department of the Interior (DOI), the Bureau of Land Management (BLM), and the Fish and Wildlife Service (FWS). *Id.* at 2. Pending before the court is the plaintiffs' motion for summary judgment (ECF No. 37), the defendants' cross-motion for summary judgment (ECF No. 43), and the plaintiffs' motion for leave to file supplemental authority (ECF No. 52).[2]

---

[1] Those individuals include the following: Debra Haaland, in her official capacity as Secretary of the Interior; Tracy Stone-Manning, in her official capacity as the Director the Bureau of Land Management; Martha Williams, in her official capacity as Director of the Fish and Wildlife Service; and Laura Daniel-Davis, in her official capacity as Acting Deputy Secretary of the Interior. Because Stone-Manning is no longer the Acting Director of the BLM, I direct the Clerk of Court to replace her with the now-Acting Director of the BLM, Bill Groffy, and to replace Martha Williams with Brian Nesvik as Director of the Fish and Wildlife Service. Finally, Laura Daniels-Davis is no longer in an acting capacity, so the docket must reflect her as Deputy Secretary of the Interior.

[2] All three motions are fully briefed. *See* Resp. mot. summ. j., ECF No. 42; Reply mot. summ. j., ECF No. 55; Resp. cross-mot. summ. j., ECF No. 43; Reply cross-mot. summ. j., ECF No. 56; Resp. mot. leave, ECF No. 54; Reply mot. leave, ECF No. 57.

For the reasons set forth herein, I grant the plaintiffs' motion for leave to file supplemental authority and the defendants' cross-motion for summary judgment, but I deny the plaintiffs' motion for summary judgment.

I.      Background

   A.  Overview

In 2020, Inoeer Rhyolite Ridge, LLC, first submitted the proposed plan of operations for the Ryholite Ridge Lithium/Boron Mine Project to BLM. Administrative Record (AR), ECF No. 27-1 at BLM_77319, 77402, 78666. Working with BLM, Ioneer revised the plan six times to conform with BLM's surface management regulations and to provide more information for BLM's environmental review. *Id.* During this time, BLM consulted with FWS, per section 7(a)(2) of the ESA, to ensure that the Project was not likely to jeopardize any ESA-listed species or destroy or adversely modify any critical habitat. AR, ECF No. 36 at FWS_625.[3] In September 2024, FWS issued a Biological Opinion (BiOp) determining that the Project was not likely to jeopardize any ESA-listed species or destroy or modify any critical habitat. *Id.* at FWS_627–88. One month later, the Acting Deputy Secretary of the Interior issued a Record of Decision approving the final plan of operations for the Project. *Id.* at BLM_69724.

The Project is located almost entirely on public lands managed by BLM, and its boundary is roughly 7,166 acres. *Id.* at BLM_78667, BLM_78667. It consists of mining and support activities, such as a quarry, a processing facility, overburden storage facilities (OSFs), a spent ore storage facility (SOSFs), and more. ECF No. 43 (citing BLM_78667). The Project sets out to excavate overburden rock and ore from the quarry. ECF No. 36 at BLM_77334. The ore is then transported to a facility within the processing plant area, and the overburden rock is transported to various OSFs. *Id.* at BLM_77334. After processing, the extracted ore yield lithium and boron, is shipped off-site. ECF No. 43 at 15 (citing ECF No. 36 at BLM 77334). The spent ore and residue are dewatered, then trucked to an on-site OSF. ECF No. 36 at BLM_77334–35. The Project is set to

---

[3] The administrative records were submitted on flash drives. The citations for ECF Nos. 27 and 36 can be found therein.

occur over 23 years with four phases: the construction phase (Years 1 through 4); the quarrying phase (Years 1 through 17); the processing phase (Years 4 through 17); and the reclamation and closure phase (Years 18 through 23). *Id.* at BLM_69734.

The plaintiffs filed suit to challenge the Project's approval—primarily on its merits, not its procedure. Stated otherwise, they largely challenge the science and reasoning underlying the Project's approval rather than the agencies' compliance with the requisite procedural steps in conferring that approval.[4] At the heart of their challenge lies their contention that the Project poses an existential risk to an endangered wildflower: Tiehm's buckwheat (*Eriogonum tiehmii*). ECF No. 19-1 at 3. FWS listed the wildflower as an endangered species under the ESA and concurrently designated 910 acres as the species' critical habitat. 87 Fed. Reg. 77368. The wildflower's entire global population exists within ten acres of public lands in the Project area. ECF No. 36 at FWS_649. The plaintiffs allege that the Project exacerbates the threat of the wildflower's extinction by encircling the entire known range and destroying 22 percent of the species' designated critical habitat. ECF No. 37 at 9 (first citing ECF No. 36 at FWS_628; and then citing *Id.* at FWS_675). They further contend that "[g]roundwater pumping from the Project will also impact the Fish Lake Valley tui chub, a rare fish species that exists only in Fish Lake Valley and was recently proposed for ESA listing." *Id.* at 10.

A.  Timeline of Events

After Ioneer submitted the first proposed plan of operations for the Project in 2020, BLM reviewed the environmental impacts and mitigation associated with the Project in an Environmental Impact Statement (EIS). ECF No. 36 at BLM_78666. In 2022, BLM published a Notice of Intent to prepare the EIS for the Project in the Federal Register, initiating the 30-day public scoping period. *Id.* at BLM_78670. BLM held two public scoping meetings for the Project and reviewed 95 comment documents. *Id.*

---

[4] The court acknowledges that the plaintiffs make some procedural arguments and addresses those arguments *infra*.

Also in 2022, FWS listed the wildflower as an endangered species under the ESA and concurrently designated 910 areas as the species' critical habitat. 87 Fed. Reg. 77368. In 2024, BLM prepared a Biological Assessment analyzing the Project's potential effects on the wildflower. ECF No. 36 at BLM_70366–987. That assessment determined that the Project would not directly disturb the existing subpopulations, but that it could be expected to disturb roughly 191 acres of its designated critical habitat. *Id.* at BLM_70373. These potential adverse effects prompted BLM to initially determine that, under section 7 of the ESA, the project "may affect" and is "likely to adversely affect" the species and its critical habitat. *Id.*

On April 1, 2024, based on BLM's effects determination, FWS received BLM's request to initiate a formal consultation pursuant to section 7 of the ESA. *Id.* at FWS_625. On April 19, 2024, a draft EIS was published on the Federal Register, opening another 45-day comment period. *Id.* BLM considered and responded to comments from that period before seeking further public review of the Final EIS (FEIS). *Id.* In September 2025, FWS issued a BiOp for the Project in response to BLM's request to initiate a formal consultation. *Id.* at FWS_627–88. In October 2024, BLM issued a Record of Decision for the Project based on the FEIS. *Id.* at BLM_78664. That decision was conditioned on compliance with FWS's biological opinion. *Id.* at BLM_78672.

## II.      Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

4

Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

III.    Discussion

**A.  The plaintiffs' motion for leave to file supplemental authority is granted.**

The plaintiffs seek to introduce notice of defendant-agency action in support of the plaintiffs' motion for summary judgment. ECF No. 52. Specifically, the plaintiffs move to submit two items: (1) BLM's Notice in the Federal Register describing its intent to prepare an Environmental Impact Statement for a proposed expansion of the Castle Mountain Mine in Southern Nevada and California, 90 Fed. Reg. 48373; and (2) a Right-of-Way application and Utilities Plan of Development under Title V of the FLPMA for a water pipeline and electrical transmission line needed to service the existing mine operations and proposed mine expansion. *Id.* The plaintiffs contend that these items contradict BLM's position "that water pipelines and related infrastructure are 'operations authorized by the mining laws,' and are not subject to FLPMA Title V requirements." *Id.* at 2. Intervenor Ioneer and the defendants oppose the request, arguing that the proposed supplemental authority is irrelevant. *See* ECF Nos. 53, 54.

These documents are subject to judicial notice because the Federal Register is a source whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *see also* 44 U.S.C. § 1507; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (holding that a court may take judicial notice under Rule 201 of publicly available government documents). As such, the court may consider them without inquiring into whether there is good cause for their submission. *See* LR 7-2(g) ("A party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause."). Therefore, I grant the plaintiffs' request to submit BLM's Notice on the Federal Register (90 Fed. Reg. 48373) and the Right-of-Way application and Utilities Plan of Development under FLPMA.

**B.   The defendants are entitled to summary judgment on all claims.**

The plaintiffs contend that they are entitled to summary judgment because DOI, BLM, and FWS "failed to 'insure' that the Project will not jeopardize the continued existence of Tiehm's buckwheat or adversely modify its critical habitat, as required under the ESA; failed to prevent unnecessary and undue degradation of the public lands, as required under FLPMA; failed to take a 'hard look' at the Project's environmental impacts, as required under NEPA and FLPMA; and relied on vague, generalized, and insufficiently developed minimization and mitigation measures, in violation of the ESA, NEPA and FLPMA." ECF No. 37 at 14–15.

In general, "when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025). "But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Id.* at 179–80. "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* at 180.

Here, the court reviews the plaintiffs' ESA, FPMA, and NEPA claims under the APA. *See id.*; *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (reviewing ESA claim under the

APA because the ESA does not provide a standard of review); *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) (reviewing NEPA claim under the APA). Thus, the arbitrary-and-capricious standard applies. *See Seven County*, 605 U.S. at 179–80; *W. Watersheds*, 632 F.3d at 481. And under this standard, I find the challenged agency action to be lawful.

### 1. The defendants complied with the ESA.

The ESA requires agencies to "insure"—that is, "to make certain, to secure, to guarantee (some thing, event, etc.)"—that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (citation modified). And federal regulation requires agencies to review their actions "at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). If so, then "formal consultation is required" unless the agency determines "that the proposed action is not likely to adversely affect any listed species or critical habitat." *Id.* at § 402.14(a)–(b). At the conclusion of formal consultation, the FWS issues a BiOp determining whether the proposed action is likely to jeopardize the species' existence or destroy or adversely modify a critical habitat. *Id.* at §§ 402.14(g), 402.02; 16 U.S.C. § 1536(b)(3)(A).

The plaintiffs argue that BLM and FWS violated the ESA in seven ways: (1) the BiOp draws conclusions contrary to the available evidence and fails to connect the facts found to the choices made; (2) the BiOp relies on vague or ineffective conservation measures; (3) the BiOp's conclusion regarding the loss of pollinator habitat is unsupported and based on conjecture; (4) the BiOp fails to consider the combined impacts of mine construction and operations; (5) the BiOp fails to consider the Project's impacts in combination with the environmental baseline; (6) the BiOp fails to consider impacts to the wildflower's recovery or define a "tipping point" at which recovery is compromised; and (7) the BiOp unlawfully relies on scientific uncertainty to

draw inferences against the species. *See generally* ECF No. 37 at 17–35. Upon review of the record, I disagree.

I find that FWS rationally determined that the project is unlikely to jeopardize the wildflower or destroy or adversely modify the wildflower's critical habitat. FWS relied on two particular matter emissions models—one focused on the dust deposition's effects on the wildflower's subpopulations, and another focused on pollutants relative to National Ambient Air Quality Standards—in determining that the Project will not adversely affect the wildflower. ECF No. 36 at FWS_669–73; *id.* at BLM_77970–71. This reliance on the reasonable opinions of FWS's own qualified experts is legally sound, even if this court finds contrary views more persuasive. *See Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

The same is true for the decision to use a minimum safety factor of 1.2 when assessing pit stability, as that decision was also backed by a reasonable expert opinion. *See* ECF No. 36 at FWS_14176; *see also id.* at FWS_14197 (finding that with grounds anchors and buttresses implemented, all quarry slopes would meet the Project slope stability criteria of a 1.2 safety factor). And the record shows that FWS sufficiently analyzed the long-term effects of the OSFs and SOSFs, *see id.* at FWS 676–77, as well as the Project's affects on the pollinator habitat, *id.* at FWS_676 (analyzing recent pollinator surveys of the action area).

FWS also identifies numerous conservation measures—both environmental protection measures and applicant-proposed conservation measures—that the Project will implement. *Id.* at FWS_638–45. FWS included these measures in analyzing the Project's effects on the wildflower and found that they would help minimize, monitor, and reduce the Project's affects on the species. *Id.* at FWS_664–87. Upon review of the record, I find the analysis, description, and incorporation of these conservation measures to be sufficient for ESA purposes.

Further, FWS sufficiently analyzed the environmental baseline and effects of the Project, as required by section 7 of the ESA. FWS evaluated the number of individuals in the wildflower's species and considered the impacts to the baseline from exploration activities. *Id.* at FWS_647–48, 656, 653–55. The BiOp considers each stressor and "all consequences to listed species or critical habitat that are caused by the [Project], including the consequences of other activities that are caused by the proposed action but that are not part of the action." *Id.* at FWS_664.

The plaintiffs' argument that the BiOp is invalid because the ESA requires FWS to define the exact "tipping point" between survival and recovery is legally unfounded. The plaintiffs fail to point to any statute requiring such an articulation. And under 16 U.S.C. § 1536(B)(3)(a), FWS has discretion to detail "how the agency action affects the species or its critical habitat." As such, there is no legal basis for this court to impose such a requirement. Also, the BiOp lists four recovery goals for the wildflower and designated critical habitat, *id.* at FWS_679, and describes how these goals will be furthered through specific conservation measures, *id.* at FWS_679–80. In light of this analysis, FWS reasonably concluded that the Project will not result in permanent habitat loss or appreciably delayed habitat protection. *Id.* at FWS_680.

Finally, the BiOp does not improperly draw inferences against the species. The record shows that the permanent loss to the existing critical habitat will be 4.9%. *Id.* at FWS_676. And the BiOp details how enough habitat will remain for plant-pollinator interactions, such that the Project is not likely to appreciably diminish the conservation value of the whole critical habit. *Id.* at FWS_687. The BiOp's admission as to the lack of data on the species prior to the Project is merely an acknowledgement of the data limitations, not a crux to draw an inference against the species. FWS analyzed the best available science. *See* FWS_669–72 (dust deposition models), *id.* at FWS_631–32 (groundwater and dewatering), *id.* at FWS_683–87 (pollinators). In doing so, it prudently admitted to the science's limitations in drawing a rational conclusion of the most likely effects. FWS articulated a rational connection between the facts found and choices made.

9

In turn, the defendants complied with ESA as a matter of law, so they are entitled to summary judgment on this claim.

### 2.   *The defendants complied with the FLPMA.*

"BLM's management of public lands [is] governed by the Federal Land Policy and Management Act of 1976 (FLPMA), which established a policy in favor of retaining public lands for multiple use management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (citation omitted). The FLPMA provides that the Secretary "regulate[s], through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands." 43 U.S.C. § 1732(b). In doing so, the Secretary must "take any action necessary to prevent unnecessary or undue degradation of the lands," including during mining projects. *Id.*

BLM defines "unnecessary or undue degradation" to mean "harm to resources or values that is not necessary to accomplish a use's stated goals or is excessive or disproportionate to the proposed action or an existing disturbance." 43 C.F.R. § 6101.4(aa). BLM has also set forth a regulatory framework for reviewing mining projects to "[p]revent unnecessary or undue degradation of public lands by operations authorized by the mining laws." 43 C.F.R. § 3809.1. This framework requires operators to obtain BLM's approval of a plan of operations before starting mining activities that involve non-negligible surface disturbance of more than five acres. *Id.* at § 3809.11(c)(6). Further, such operations must meet BLM's performance standards in order to prevent unnecessary or undue degradation. *Id.* at §§ 3809.415, 3809.420. One way BLM may prevent that degradation is by conditioning approval of a plan of operations on mitigation measures or modifications that reel operations into compliance with performance standards. *See* 43 C.F.R. § 3809.420; *see also, e.g., Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592 (9th Cir. 2010).

The plaintiffs argue that BLM violated FLPMA by failing to prevent unnecessary or undue degradation, failing to require a right-of-way for the water pipeline, and failing to apply the proper FLPMA regulatory authority. I disagree on all fronts.

First, BLM reasonably found that the Project will not result in unnecessary or undue degradation of Tiehm's buckwheat. The Record of Decision includes several conservation and mitigation measures aimed at protecting the wildflower, and requiring such measures to meet FLPMA's performance standards is within BLM's discretion. *See Te-Moak Tribe*, 608 F.3d 592; ECF No. 36 at BLM_78674, 7841–42, 78675.

Second, it was not improper for BLM to approve the Project before Ioneer obtained all the required water use permits. Though 43 C.F.R. § 3809.420 requires operators to comply with all state and federal laws, it does not require operators to preemptively obtain all permits that a project may require. *See also* 43 C.F.R. § 3809.401. Stated otherwise, approving the Project before Ioneer had obtained the necessary permits did not in itself violate § 3809.420.

Third, BLM properly applied its regulatory framework to approve the Project. The plaintiffs contend that BLM violated FLPMA by authorizing the 19-mile water pipeline transportation corridor. But this approval falls within the zone of discretion afforded to BLM under the regulatory framework. *See* 43 C.F.R. § 3809.5 (defining "operations"). And BLM is not required to approve pipelines under Title V of the FLPMA exclusively. *See* 43 U.S.C. § 1761(a). As such, BLM's approval is sound. Further, the regulatory framework does not require BLM to verify mining claim validity before approving a plan of operations. *See Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 492 (D.D.C. 2020), *aff'd*, 105 F.4th 449 (D.C. Cir. 2024) (noting that "the Mining Law, its implementing regulations, and related case law have never required Interior or BLM to verify the validity of a claim by independently confirming discovery"). Such a determination is only required when a claimant is seeking to obtain a patent right from the United States, 43 C.F.R. § 3862.1-1(a), or has proposed operations on withdrawn lands, *id.* at

§ 3809.100. Those circumstances do not apply here. Because the defendants complied with the FLPMA as a matter of law, they are entitled to summary judgment on this claim.

### 3. The defendants complied with the NEPA.

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "Ultimately, NEPA requires federal agencies to issue an EIS before undertaking 'major Federal actions significantly affecting the quality of the human environment.'" *Northern Alaska Environmental Center*, 457 F.3d at 975. "A court's inquiry, when reviewing whether an agency complied with NEPA, is whether the agency adequately considered a project's potential impacts and whether the consideration given amounted to a 'hard look' at the environmental effects." *Id.* A "hard look" considers "all foreseeable direct and direct impacts." *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

The Supreme Court recently emphasized that "the bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven County*, 605 U.S. at 185. "When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 182–83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. "A reviewing court may not 'substitute its judgment for that of the agency as to the environmental consequences of its actions.'" *Id.* (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

12

The plaintiffs argue that the FEIS violates NEPA by failing to consider the baseline conditions and impacts from groundwater pumping in Fish Lake Valley, take a "hard look" at impacts to the wildflower and the Fish Lake Valley tui chub, and analyze the effectiveness of purported mitigation measures. ECF No. 37 at 46–47. I disagree.

First, the plaintiffs waived their argument regarding BLM's failure to analyze the baseline conditions and impacts from groundwater pumping in Fish Lake Valley because it failed to raise it during the public comment period. *See Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1036 (9th Cir. 2019) ("Plaintiffs 'must structure their participation' in the agency's decisionmaking process so as to 'alert[] the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'" (citation omitted)). And even if they had preserved that argument, it would still fail on its merits because the FEIS did in fact sufficiently address the impacts from groundwater pumping in Fish Lake Valley. *See* ECF No. 36 at BLM_74203–04, 74285–87 (addressing the impacts of groundwater in Fish Valley Lake of offering solutions). The extent to which the FEIS addressed that concern falls within the broad zone of reasonableness and is therefore owed deference. *See Seven County*, 605 U.S. at 183.

Second, BLM sufficiently took a "hard look" at the impacts on Tiehm's buckwheat and Fish Lake Valley tui chub. The FEIS discusses the Project's impacts on Tiem's buckwheat and planned reclamation efforts extensively. *See id.* at BLM_74838–39. And its decision to use a minimum safety factor of 1.2 when assessing pit stability is backed by a reasonable expert opinion. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive."); *see also* ECF No. 36 at BLM_74720 (relying on two expert reports that found 1.2 to be an acceptable safety factor based on the "current Standard of Care for pit slope analysis and design"); *id.* at BLM_74961. As for the tui chub, BLM reasonably concluded that Ioneer's commitment to offset its pumping in Fish Lack Valley will sufficiently avoid impacting the species. *See id.* at

BLM_74761, 75329, 47587–90. This conclusion is especially reasonable considering that the Project's dewatering takes place outside the area where the tui chub is located. *Id.* at BLM_74756. The FEIS's analysis on these matters is therefore sufficient under NEPA.

Third, BLM sufficiently analyzed and ensured the effectiveness of mitigation measures. Though NEPA requires an EIS to discuss "means to mitigate adverse environmental impacts," *Northern Alaska Environmental Center*, 457 F.3d at 975 (quoting 40 C.F.R. § 1502.16(h)), it "does not require an agency to formulate and adopt a complete mitigation plan." *Id.* Here, the EIS sufficiently discusses means to mitigate the Project's adverse environmental impacts. *See* ECF No. 36 at BLM_74835–41. Those means are detailed and corroborated with science. *See, e.g., id.* at BLM_76057–58, 74838 (detailing how the combination of ground anchors, buttresses, and a multislope monitoring system will prevent direct harm to Tiehm's buckwheat from a quarry wall collapse); *id.* at BLM 76059–70, 74838–39 (relying on scientific studies to inform the design of pollinator habitat reclamation and rehabilitation); *id.* at BLM_74843 ("The surface disturbance from exploration, dewatering facilities, and water supply facilities would occur outside the fenced Tiehm's buckwheat designated critical habitat."). Therefore, I find that the mitigation measures set forth in the FEIS are sufficiently detailed and reasonable under NEPA. Because the defendants complied with NEPA as a matter of law, I grant summary judgment in their favor on this claim.

## IV.    Conclusion

IT IS HEREBY ORDERED that the plaintiffs' motion for leave to file supplemental authority **[ECF No. 52] is granted**, and motion for summary judgment **[ECF No. 37] is denied.**

IT IS FURTHER ORDERED that the defendants' cross-motion for summary judgment **[ECF No. 43] is granted.**

Dated: March 27, 2026

_____
Cristina D. Silva
United States District Judge

14